23929

Fred SINGLETON, Respondent v. The STATE, Petitioner.

(437 S.E. (2d) 53)

Supreme Court

76

*Nancy C. McCormick*, of *South Carolina Protection and Advocacy System, for the Handicapped, Inc.*, *Jacqueline D. Belton*, of *Mental Health Ass'n in South Carolina*, *J. Steedley Bogan*, of *South Carolina Ass'n of Head Injury Groups*, and *Elizabeth G. Patterson*, of *South Carolina Psychiatric Ass'n*, Columbia, *for amici curiae.*

*T. Travis Medlock*, Atty. Gen., *Donald J. Zelenka*, Chief Deputy Atty. Gen., and *Delbert H. Singleton, Jr.*, Asst. Atty. Gen., Columbia, *for petitioner.*

*John H. Blume*, of *S.C. Death Penalty Resource Center*, and *Thomas W. Bunch, II*, of *Robinson, McFadden & Moore*, Columbia, *for respondent.*

Heard Dec. 8, 1992.

Decided Aug. 30, 1993.

TOAL, Justice:

The State appeals from an order, issued at a postconviction relief hearing on Respondent's sanity, which vacated a death sentence and re-sentenced the Respondent to life imprisonment. We AFFIRM in part and REVERSE in part.

## FACTS

Respondent, Singleton, was convicted and sentenced to death for murder, burglary, larceny of a motor vehicle, and first-degree criminal sexual conduct. We affirmed both the conviction and sentence on direct appeal in *State v. Singleton*, 284 S.C. 388, 326 S.E. (2d) 153, *cert. denied*, 471 U.S. 1111, 105 S.Ct. 2346, 85 L.Ed. (2d) 863 (1985). Respondent, in August 1985, filed a petition for postconviction relief in Newberry County which was denied, on May 21, 1986. Singleton appealed, and we denied certiorari and dismissed the appeal.

Singleton's execution was stayed pending the filing of certiorari to the United States Supreme Court. Failing to timely pursue the petition for certiorari, we issued an order to the Commissioner of the South Carolina Department of Corrections, on August 17, 1987, directing Singleton's execution.

Prior to the imposition of sentence, Singleton filed a petition for writ of *habeas corpus* in the United States District Court for the District of South Carolina, on September 14, 1987. The District Court dismissed Singleton's petition without prejudice and required his return to state court to exhaust all state claims. The United States Court of Appeals for the Fourth Circuit affirmed the dismissal in an unpublished opinion. *Singleton v. McKellar*, 873 F. (2d) 1440 (4th Cir. Apr. 3, 1989) (unpublished opinion), *cert. denied*, 493 U.S. 874, 110 S.Ct. 210, 107 L.Ed (2d) 163 (1989).

Singleton filed a second application for postconviction relief in Newberry County, in March 1990. In this latest petition, Singleton alleged that he was not competent to be executed. The PCR court conducted a hearing on November 13, 1990 to determine the proper standard to be utilized in assessing Singleton's competency to be executed. The PCR court adopted the American Bar Association Criminal Justice Mental Health Standard (A.B.A. Standard) proposed by Singleton in an order dated November 19, 1990.

After an evidentiary hearing, in December 1990, the PCR judge issued an order holding Singleton incompetent to be executed under either the A.B.A. Standard or the standard set forth in Justice Powell's concurring opinion in *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595. 91 L.Ed. (2d) 335 (1986). The PCR court's order, dated may 8, 1991, vacated Singleton's death sentence and imposed a sentence of life imprisonment. It is from this order that the State appeals.

## LAW/ANALYSIS

The State asks us to find error on two primary issues. First, the State contends that the PCR court erred in adopted the A.B.A. Standard of incompetency rather than the standard set forth in Justice Powell's concurrence in *Ford v. Wainwright, supra.* Second, the State contends that the PCR judge erred in vacating Singleton's sentence and imposing a life sentence as a remedy, where the effect of the decision is to judicially commute a sentence in violation of Article IV, Section 14 of the South Carolina Constitution. A third and equally critical question is inherent in both of the issues raised by the State, and that is whether the State can employ forced medication to facilitate a prisoner's competency for execution.

The Applicable Competency Standard for Execution

The pivotal issue in this case is whether the PCR court erred in adopting the A.B.A. Standard of incompetency rather than the standard set forth in Justice Powell's concurrence in *Ford*. The Respondent relies on the A.B.A. Standard which is set forth in the Criminal Justice Mental Health Standard 7-5.6, as:

> a. Convicts who have been sentenced to death should not be executed if they are currently mentally incompetent. If it is determined that condemned convict is currently mentally incompetent, execution should be stayed.
> b. A convict is incompetent to be executed if, as a result of mental illness or mental retardation, the convict cannot understand the nature of the pending proceedings, what he or she was tried for, the reason for the punishment or the nature of the punishment. A convict is also incompetent if, as a result of mental illness or retardation, the convict lacks sufficient capacity to recognize or under-

stand any fact which might exist which would make the punishment unjust or unlawful, or lacks the ability to convey such information to counsel or the court.

*Id.*

This A.B.A. Standard sets forth a two-pronged test when inquiring into the competency of a defendant subject to execution. The first prong can be characterized as the cognitive prong, which is defined as the ability to recognize the nature of the punishment and the reason for the punishment. The second prong is characterized as the assistance prong, which is defined as the ability to assist counsel, or the court, in identifying exculpatory or mitigating information.

In *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed. (2d) 335 (1986) (Powell, concurring), the United States Supreme Court in a plurality opinion held that the execution of an inmate who becomes incompetent or insane after conviction and sentencing is violative of the Eighth Amendment. The plurality did not, however, set forth what standard was applicable in the determination of incompetence or insanity. Justice Powell, the swing vote in the opinion, proposed such a standard when he stated in his concurrence that, "I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* at 422, 106 S.Ct. at 2608, 91 L.Ed. (2d) at 354.

Justice Powell was a voice of one, yet the standard he posited was embraced by some courts as the constitutional minimum. *Johnson v. Cabana,* 818 F. (2d) 333 (5th Cir. 1981), *cert. denied,* 481 U.S. 1961, 107 S.Ct. 2207, 95 L.Ed. (2d) 861 (1987).[1] The A.B.A. Standard reflects the Powell formulation in the cognitive prong of its test. Justice Powell in his concurrence discussed the rationale behind the Eight Amendment prohibition of executing the insane.

---

[1] Justice Brennan and Justice Marshall, the plurality in *Ford,* dissented from the denial of certiorari in *Johnson v. Cabana.* In their dissent, they explained that *Ford* was applicable not only to the insane, but to the incompetent. This may be a distinction without a difference. Where the appropriate test is applied, the result should be the same regardless of incompetency or insanity. A more detailed discussion of the genesis of *Ford* and the procedural quagmire the opinion presents is contained in *Martin v. Dugger,* 686 F. Supp. 1523 (S.D. Fla. 1988).

[T]oday as at common law, one of the death penalty's critical justifications, its retributive force, depends on the defendant's awareness of the penalties existence and purpose. Thus, it remains true that executions of the insane both impose a uniquely cruel penalty and are inconsistent with one of the chief purposes of executions generally. . . .

. . . .

A number of States have more rigorous standards, but none disputes the need to require that those who are executed know the fact of their impending execution and the reason for it.

*Id.* 477 U.S. at 421-422, 106 S.Ct. at 2607-2608, 91 L.Ed. (2d) at 354.

Justice Powell then addressed the states with more rigorous standards in footnote 3 of his concurring opinion.

[a] number of States have remained faithful to Blackstone's view that a **defendant cannot be executed unless he is able to assist in his own defense.** . . . Modern Case authority is sparse, and while some older cases favor the Blackstone view, those cases largely antedate the recent expansion of both the right to counsel and the availability of federal and state collateral review. . . . Under these circumstances, I find no sound basis for constitutionalizing the broader definition of insanity, with its requirements that the defendant be able to assist in his own defense. States are obviously free to adopt a more expansive view of sanity in this context than the one the Eighth Amendment imposes as a constitutional minimum.

*Id.* at 422 n. 3, 106 S.Ct. at 2608 n. 3, 91 L.Ed. (2d) at 354 n. 3 [emphasis added] [citations omitted]. This "more expansive" view is in full accord with the second prong of the A.B.A. Standard; however, Justice Powell rejected it.

As we decide the appropriate standard for South Carolina, it is helpful to review the development of the "assistance" prong. There is a significant common law background for the requirement that a defendant to be able to assist in his defense, even after conviction. "And it seems agreed at this Day, that if one who has committed a capital Offence, become *Non Compos* . . . after [a] Conviction, that he shall not be exe-

cuted." 1 Hawkins, *Pleas of the Crown* 2 (1716). In Hawles, *Remarks on the Trial of Mr. Charles Bateman,* 11 HOW. St.Tr. 474 (1685), the Solicitor-General commented:

> for nothing is more certain in Law, than that a Person who falls mad ... after judgment, he shall not be executed: tho I do not think the reason given for the Law in that Point will maintain it, which is, that the End of Punishment is the striking a Terror into others, but the execution of a madman had not that effect; which is not true, for the Terror to the living is equal, whether the Person be mad or in his Senses.... But the true reason of the Law I think to be this, a Person of *non sana Memoria,* and a Lunatik during his Lunacy, is by an act of God ... disabled to make his just Defence, there may be Circumstances lying in his private Knowledg, which would prove his Innocency, of which he can have no advantage, because not known to the Persons who shall take upon them his Defence.

*Id.* at 476.

Sir Matthew Hale reasoned that "if after judgment he becomes *non sane memory* ... his execution shall be spared; for were he of sound memory, he might allege somewhat in stay of judgment of execution." 1 M. Hale, *The History of the Pleas of the Crown* 34-35 (1736). The greatest common law scholar, Sir William Blackstone, explained that "the law knows not but he might have offered some reason, if in his senses, to have stayed these respective proceedings." 4 W. Blackstone, *Commentaries* 389 (1769).

The Law Reporter for the A.B.A. Standards for Criminal Justice related to Competency and Capital Punishment, Professor James Ellis, testified before the trial court concerning the derivation of the second or "assistance" prong. In his testimony, Professor Ellis explained that the origin of the "assistance" prong language was Justice Frankfurter's dissent in *Solesbee v. Balkcom,* 339 U.S. 9, 70 S.Ct. 457, 94 L.Ed. 604 (1950). In his dissent in *Solesbee,* Justice Frankfurter made a detailed analysis of the applicable common law, and concluded that:

> [h]e should not be denied the opportunity to inform the mind of a tribunal—be it a Governor, a board or a judge—that has to decide between life and death, not as a matter of grace but on the basis of law. For if he be insane his life cannot be forfeit except in violation of the law of the land.

*Id.* at 24, 70 S.Ct. at 464, 94 L.Ed. at 613.

Other states have adopted similar views[2] where, in order to execute a defendant, he must have the intelligence to convey any knowledge of a fact which would make his punishment unjust or unlawful to his attorney. *In re Smith*, 25 N.M. 48, 179 P. 819 (1918); *see People v. Geary*, 298 Ill. 236, 131 N.E. 652 (1921) (using a test for sanity identical to the current A.B.A. Standard); *In re Grammer*, 104 Neb. 744, 178 N.W. 624 (1920) (using the same assistance prong as that advocated in the A.B.A. Standard); *see also* 24 C.J.S. *Crim. Law* § 1619 (1961); 24 C.J.S. *Crim. Law* § 1547 (1989).

The "assistance" prong is not just a creature of early common law cases. As recently as 1990, the Supreme Court of Washington was faced with an almost identical issue. In *State v. Harris*, 114 Wash. (2d) 419, 789 P. (2d) 60 (1990), the Court, using a common law analysis, adopted a test very similar to the A.B.A. Standard. The "assistance" prong adopted in Washington differs only slightly and defines exactly what constitutes assistance as:

> [t]he defendant need not be able to 'suggest a particular trial strategy', however, or to 'choose among alternative defenses'. . . . Nor does inability to recall past events necessarily constitute incompetence. For example, many courts have held or acknowledged that amnesia does not necessarily constitute incompetence. . . .
>
>             . . . .
>
> Thus, to be 'able to assist' postconviction proceedings, the defendants need not be able to think of new issues for counsel to raise, nor must they necessarily be able to recall the events surrounding the crime. What is required is

---

[2] The adoption of the "assistance" prong in most states has been by statute; however, this has not been exclusive. The trend seems to be a codification of the common law rules.

that they understand they have been sentenced to death for murder or be able to communicate rationally with counsel.

*Id.* at 429, 789 P.(2d) at 66.

The common law remains in full force and effect in ■ South Carolina unless changed by clear and unambiguous legislative enactment. *See State v. Carson,* 274 S.C. 316, 262 S.E. (2d) 918 (1980), *citing, Coakley v. Tidewater Const. Corp.,* 194 S.C. 284, 9 S.E. (2d) 724 (1940); *Nuckolls v. Great Atl. & Pac. Tea Co.,* 192 S.C. 156, 5 S.E. (2d) 862 (1939); *see also State v. Charleston Bridge Co.,* 113 S.C. 116, 101 S.E. 657 (1919). The General Assembly has not addressed the level of competency required for execution, nor has there been any legislation concerning the test for incompetency in the execution context. Absent such legislation, the common law must apply.

The case authorities in South Carolina are sparse. In *State v. Bethune,* 88 S.C. 401, 71 S.E. 29 (1911), the appellant raised the issue of the assistance prong in the determination of competency. This Court never reached the issue because the defendant would not have prevailed under the more stringent standard which was actually applied. *Id.* In *State v. Middleton,* 295 S.C. 318, 368 S.E. (2d) 457 (1988), the defendant was not incompetent under any standard applied, and we were not asked to address the assistance prong issue. In *Middleton,* not only was it clear that the defendant appreciated the gravity of the crime and punishment, but it was equally clear that he was able to make statements and be actively involved in his defense. *Id.*

The leaves South Carolina firmly in the arms of the English common law. In S.C. Code Ann. § 14-1-50 (1986), the General Assembly adopted the common law of England, where it was not altered by the code or inconsistent with the constitution or laws of the state. This codification of the English Common Law should not be construed as limiting the Court from adapting this judge-made law. The codification of judge-made law does not transform it into a pure statutory creature. It has always been the purview of a court to change the common law; however, on these issues, there is little need. The correct standard, which is firmly rooted in the English and American

common law, is the two-prong analysis adopted most recently by the Washington Supreme Court in *Harris*.

The A.B.A. Standard generally reflects this text, but is not tempered with the rational communication element for the assistance prong, as announced in *Harris*. We, therefore, must adopt a slightly modified standard in South Carolina which satisfies the mandates of federal due process, the common law, and the South Carolina Constitution. By so doing, we announce the appropriate test in South Carolina as a two-prong analysis. The first prong is the cognitive prong which can be defined as: whether a convicted defendant can understand the nature of the proceedings, what he or she was tried for, the reason for the punishment, or the nature of the punishment. The second prong is the assistance prong which can be defined as: whether the convicted defendant possesses sufficient capacity or ability to rationally communicate with counsel.

When this test is applied to the facts, it becomes obvious that Singleton is incapable of meeting even a modicum of competency. The record contains a wealth of evidence which supports the PCR judge's finding of incompetence. Singleton is completely unaware that he is capable of dying in the electric chair. His reliance on protective "genes" and his inability to respond to his counsel's questions with anything other than a yes-no are indicative of Singleton's failure to understand either the reason or the nature of his punishment. Singleton is also incapable of communicating any information to his counsel. Based on the direct examination in the record, there can be no doubt that Singleton is incapable of rational communication. Failure of either prong of the test is sufficient to warrant a stay, and in the present case, there is ample evidence to demonstrate that Singleton can not pass either prong.

Vacation of Sentence

The State's second issue on appeal is whether the PCR judge erred in vacating Singleton's sentence and imposing a life sentence as a remedy, where the effect of the decision is to judicially commute a sentence in violation of Article IV, Section 14 of the South Carolina Constitution. The first step in this analysis is to examine the order issued by the PCR court.

In his discussion of remedy, Judge Thomas L. Hughston, Jr. stated that, based on the evidence, Singleton was not likely to every regain competence. The judge then concluded that the appropriate remedy was "to commute Mr. Singleton's death sentence to one of life imprisonment." At the outset, the judge's use of the word "commute" is disturbing, but the reader must look further in the order. In his Conclusion the judge orders:

> [f]or the reasons set forth above, I conclude that applicant is incompetent to be executed. As a result of his incompetency, his sentence of death is **vacated**, and he is hereby **sentenced to life imprisonment**.

[Emphasis added.]

The PCR judge vacated the sentence of death and then reimposed a new sentence. This was not done as a matter of clemency, but as a remedy which the PCR judge found was supported by the evidence in the record. The State argues that the General Assembly provided in S.C. Code Ann. § 17-25-370 (1976) that an execution must be carried out "unless stayed by oder of the Supreme Court or respite or commutation of the Governor." The State posits that this statute, along with the exclusivity of the Governor's commutation powers, precludes a court sitting in postconviction relief from "commuting" a sentence of death.

South Carolina's Uniform Post-Conviction Procedure Act, S.C. Code Ann. §§ 17-27-10 et seq. (Supp. 1990), establishes a civil proceeding that enables a prisoner to challenge the legality of his detention. In S.C. Code Ann. § 17-27-20(b) (1986), the remedy available to a PCR court is:

> not a substitute for nor does it affect any remedy incident to the proceedings in the trial court, or of direct review of the sentence or conviction. Except as otherwise provided in this chapter, it comprehends and takes the place of all other common law, statutory or other remedies heretofore available for challenging the validity of the conviction or sentence. It shall be used exclusively in place of them.

*Id.* The procedural difficulty here is that, although in the nature of PCR, the hearing was held solely to determine the

competency of an inmate awaiting execution.

The State cites the case of *Gilstrap v. State*, 252 S.C. 625, 168 S.E. (2d) 88 (1969) (assuming all allegations are true, the relief to be granted on PCR is remand), and *Young v. State*, 250 S.C. 476, 158 S.E. (2d) 764 (1968) (a void indictment did not entitle defendant to release), as limitations on the court's ability to vacate a sentence and reimpose a new sentence in PCR proceedings. Both cases, although distinguishable on the facts, offer some guidance. In *Gilstrap* and *Young*, the applicants for postconviction relief were seeking release from incarceration as a remedy, whereas, on the present facts, there is no such request; yet in both cases, we established the parameters for the appropriate remedy on PCR. Here the granted relief appears to be beyond the scope of an appropriate remedy on PCR.

The PCR judge did not commute the sentence, but in vacating the sentence, he erred. The order of the court was not a grant as a matter of grace in the fashion of a commutation, but it does ignore several relevant considerations. The first consideration is that the judge based his order on the assumption that Singleton was hopelessly insane, and that no cure for his illness was possible. Perhaps under the scope of our current psychological knowledge, this is true; but there is always a potential for change. To carve out a remedy which ignores the ebb and flow of medical science is to create a rule which potentially could be impossible to live with in years to come. The second consideration is that the remedy employed by the PCR judge exceeds the range of options available under postconviction relief.

The court certainly has the power to vacate a sentence, and under some circumstances, the vacation of a sentence may be the only appropriate remedy. Where a defendant has been falsely tried and convicted of a crime and the true perpetrator is discovered at a later date, then a clear-cut remedy is to vacate the original sentence. No such circumstance exists here; and without this predicate, the vacating of the sentence is not justified.

Recognizing that competency to be executed is not a common issue raised in PCR proceedings, the available remedies still should not venture beyond those normally granted to other PCR applicants. Here the more important questions,

under these unusual circumstances, are: (1) what is the correct remedy; and (2) what procedures must be followed to implement the proper remedy.

Remedy and Procedures

Upon the issuance of an Order for Execution by this Court, the defendant or his/her guardian may apply for subsequent Post Conviction Relief on the basis of competency, pursuant to S.C. Code Ann. § 17-27-20(a)(6) (1985). At the evidentiary hearing, the applicant, through competent evidence or expert testimony, must show by a preponderance of the evidence that he or she lacks the requisite competency for execution. If the PCR court finds the applicant incompetent in accordance with the standard adopted in this opinion, then the appropriate remedy is to issue a temporary stay of execution pending a mandatory review by this Court.

Once the defendant is found incompetent and the stay of execution is affirmed by this Court, the burden necessarily shifts to the State to move for a hearing upon the defendant's return to competency. At this subsequent hearing, the State must show by a preponderance of the evidence that the defendant is competent to be executed. If the State establishes competency, then the PCR court may lift t he previous stay of execution subject to the review of this Court.

Forced Medication

The last issue which must be resolved is whether the State can administer, by force, medication to treat Singleton's incompetence in preparation for execution. The leading case on this controversial issue is *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.E. (2d) 178 (1990). In *Harper*, the Court held that the Due Process clause permits forced treatment with antipsychotic drugs only where the inmate is dangerous to himself, or to others, and the treatment is in his medical interest. *Id.* Writing for the Court, Justice Kennedy, using a substantive due process analysis, balanced the State's legitimate penological interest of combating the danger posed by a violent mentally ill inmate, against the inmate's liberty interest of being free from the unwanted administration of antipsychotic drugs. *Id.*

Another U.S. Supreme Court decision on forced medication was announced in May 1992, in *Riggins v. Nevada*, 504 U.S. —,

112 S.Ct. 1810, 118 L.Ed. (2d) 479 (1992). In *Riggins*, there was a forced medication of a defendant during trial. The Court held this as violative of due process without a showing that there were no less intrusive alternatives, that the medication wa medically appropriate, and that it was essential for the safety of the defendant and the safety of others. *Id.* This decision announced a more stringent standard for a defendant at the trial stage than for an inmate in the postconviction stage; however, the majority denied that it was to the level of strict scrutiny. *Id.* The Court also recognized the potential medical harm which stems for the use of antipsychotic drugs. *Id.*

Both the *Riggins* and *Harper* decisions have established the federal due-process analysis required in a forced-medication case. They do not, however, answer the state constitutional question. The most recent determination by a state court on the subject is found in *Louisiana v. Perry*, 610 So. (2d) 746 (La. 1992).

In *Perry*, the Louisiana Supreme Court found a state constitutional basis for the prohibition of forced medication on a convicted inmate. Citing the Louisiana Constitutional provisions which provide for a right to privacy, the Court specifically stated that the forced medication violated, "the right to decide what is to be done medically with one's brain and body; the right to control one's mind and thoughts; and the freedom from unwarranted physical interference with one's person." *Id.* at 755. The Louisiana Constitution's provision which the court relied on guarantees that, "every individual shall be secure in his 'person' against 'unreasonable searches, seizures, or invasion of privacy.' " *Id.*

South Carolina has a strikingly similar constitutional provision in S.C. Const. art. I, § 10, which provides:

> [t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated. . . .

*Id.* This provision in the S.C. Constitution is no less compelling that the provision in the Louisiana Constitution. Moreover, when the provision is weighed with the due-process inquiry mandated by *Harper*, it becomes apparent that the analysis followed by Louisiana is correct.

We hold that the South Carolina Constitutional right to privacy would be violated if the State were to sanction forced medication solely to facilitate execution. An inmate in South Carolina has a very limited privacy interest when weighed against the State's penological interest; however, the inmate must be free from unwarranted medical intrusions. Federal due process and our own South Carolina Constitution require that an inmate can only receive forced medication where the inmate is dangerous to himself or to others, and then only when it is in the inmate's best medical interest.

Another thorny issue which arises in this context flows from the medical profession's ethical standards. The Louisiana Court in *Perry* cited Hippocrates and the physician's oath as:

> I Swear by Apollo the physician, by Aesculapius, Hygeia, and Panacea, and I take to witness all the gods, all the goddesses, to keep according to my ability and my judgment the following Oath: . . . I will prescribe regimen for the good of my patients according to my ability and my judgment and never do harm to anyone. To please no one will I prescribe a deadly drug, nor give advice which may cause his death. . . . I will preserve the purity of my life and my art. . . . In every house where I come I will enter only for the good of my patients, keeping myself far from all intentional ill doing. . . .

*Id.* at 752.

The American Medical Society and the American Psychiatric Associations have adopted positions in their respective ethical codes opposing participation by medical professionals in the legally authorized execution of a prisoner. Their reasoning is the causal relationship between administering a drug which allows the inmate to be executed, and the execution itself. They opine that the administration of the drug is responsible for the inmate's ultimate death. AMA Opinion 2.06 (prohibits a physician from participating in a legally authorized execution); *see generally* Wallace, *Incompetency for Execution*, 8 J. Legal Med. 265 (1987); American Psychiatric Association, *The Principles of Medical Ethics: With Annotations Especially Applicable to Psychiatry* § 1(4) (1985); Capital Punishment, *Proc. House Delegate AMA* 85 (1980).

The position of the medical community are, if nothing else, an indication of the unusual nature of forced medication solely to facilitate execution.[3] In Singleton's case, the problem is exacerbated because of the extent of Singleton's organic brain damage. The record on PCR shows, through expert medical testimony, that Singleton likely will not become competent throughout the administration of antipsychotic drugs. It is also clear that, because of the organic brain damage, Singleton will probably have a hypersensitive reaction to the medication, which in turn increases the harmful side effects. On these facts, the medical ethical position reinforces the mandates of our constitutional law, which dictate that we prohibit the State's use of antipsychotic drugs solely to facilitate an execution.

We, therefore, hold today that the two-prong test for incompetency is the law of South Carolina. We further hold that the appropriate remedy for an incompetent inmate on death row is to seek a stay, following the procedures outlined in this opinion. Finally, on the issue of forced medication, we find that justice can never be served by forcing medication on an incompetent inmate for the sole purpose of getting him well enough to execute.

For these reasons, the PCR court's decision is AFFIRMED in part, REVERSED in part, and REMANDED to the PCR court for proceedings consistent with this opinion.

HARWELL, C.J., CHANDLER and FINNEY, JJ., and BRUCE LITTLEJOHN, Acting Associate Justice, concur.

---

[3] There is also ample precedent which shows the deference the medical profession receives from the courts in medical matters. *See Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed. (2d) 552 (1979) (deferring to psychiatric diagnosis in fashioning clear and convincing standards for involuntary commitments); *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed. (2d) 554 (1980) (where the transfer of an inmate to a mental hospital was a medical decision).