626 S.E.2d 805

**Mar–Reece Aldean HUGHES, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

No. 26115.

Supreme Court of South Carolina.

Heard Oct. 19, 2005.
Decided Feb. 13, 2006.

Teresa L. Norris, of the Center for Capital Litigation, of Columbia, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, and Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia, for Respondent.

Justice BURNETT:

We are asked to decide whether Mar–Reece Aldean Hughes (Petitioner), who has been sentenced to die for the murder of a police officer, is mentally competent to waive his statutory right to pursue post-conviction relief (PCR) and be executed forthwith. We conclude Petitioner is not mentally competent at this time to waive his right to pursue PCR.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was convicted of murder, armed robbery, criminal conspiracy, possession of a firearm during the commission of a violent crime, and possession of a stolen vehicle at a trial in York County in September 1995. The jury found as an aggravating circumstance that the victim was a local law enforcement officer performing his official duties. Petitioner was sentenced to death. This Court affirmed the convictions

and sentence. *State v. Hughes*, 336 S.C. 585, 521 S.E.2d 500 (1999), *cert denied, Hughes v. South Carolina*, 529 U.S. 1025, 120 S.Ct. 1434, 146 L.Ed.2d 323 (2000).

The convictions arose from the fatal shooting of police officer Brent McCants on September 25, 1992. Petitioner and Eric Forney, armed with a gun, accosted two college students in the parking lot of a restaurant in Charlotte, North Carolina, and stole their car. The two men then drove to Rock Hill where Officer McCants stopped them for driving without headlights. McCants was shot several times and his police-issue walkie-talkie was taken from his belt as he lay on the side of the road. Petitioner and Forney were apprehended shortly thereafter. *Hughes*, 336 S.C. at 589, 521 S.E.2d at 502.

The State sought the death penalty against both Petitioner and Forney. They were tried separately. At his trial, Forney claimed Petitioner was the triggerman. Forney was convicted of murder, criminal conspiracy, and armed robbery and was acquitted of possession of a pistol during the commission of a violent crime. Forney was sentenced to life imprisonment after the jury failed to return a unanimous verdict in the sentencing phase, and the convictions and sentences were affirmed on appeal. *State v. Forney*, 321 S.C. 353, 468 S.E.2d 641 (1996). At Petitioner's trial, Petitioner admitted he participated in the armed robbery of the vehicle and that he was driving at the time McCants stopped them, but claimed Forney shot McCants from the passenger seat and stole the officer's walkie-talkie.

On May 11, 2000, we remanded Petitioner's case to the circuit court for a competency hearing after Petitioner wrote the Attorney General requesting to waive further proceedings and be executed. Petitioner changed his mind before a competency hearing was held and filed a post-conviction relief (PCR) application on September 21, 2000. Less than a week later, Petitioner filed a *pro se* motion requesting counsel be relieved and he be executed.

After a court-ordered evaluation but before a competency hearing, Petitioner again changed his mind and decided to pursue PCR. A competency hearing began on February 25, 2002, but was continued because Petitioner had been forcibly

medicated in violation of a court order. Petitioner indicated to counsel during a recess in the hearing that he wished to waive his right to PCR and be executed. Petitioner's mental status was re-evaluated and a competency hearing was held in April 2002.

Judge Paul E. Short, Jr. on September 18, 2002, ruled Petitioner was competent to waive his right to counsel and PCR and competent to be executed. An appeal of that ruling was pending before us when, acting *sua sponte* on March 7, 2003, we ordered Petitioner's appeal be held in abeyance pending a decision in *Council v. Catoe,* 359 S.C. 120, 597 S.E.2d 782 (2004). We subsequently held in *Council* that a mentally incompetent PCR applicant is not entitled to a stay of proceedings pending a determination of his competency to proceed. Instead, a mentally incompetent applicant and his counsel are required to pursue PCR on issues which do not require the applicant's assistance. The applicant will have an opportunity to raise fact-based issues requiring his assistance at a later PCR proceeding if he regains competence. *Id.* at 125–30, 597 S.E.2d at 785–87.

On June 25, 2004, we remanded the case to circuit court for another hearing on whether Petitioner is presently competent to waive his right to pursue PCR and whether that decision is knowing and voluntary pursuant to the standard established in *Singleton v. State,* 313 S.C. 75, 437 S.E.2d 53 (1993).

A competency hearing was held on September 15, 2004, before Judge Paul M. Burch following two court-ordered evaluations. Judge Burch on September 24, 2004, ruled Petitioner is presently competent under the *Singleton* standard to waive his right to PCR and his decision was knowing and voluntary.

## ISSUE

Did the circuit court err in ruling that Petitioner is mentally competent to waive his right to pursue PCR with counsel's assistance and that his decision to do so was knowing and voluntary?

## STANDARD OF REVIEW

■ This Court is charged with the responsibility of issuing a notice authorizing the execution of a person who has been duly convicted in a court of law and sentenced to death. The Court will issue an execution notice after that person either has exhausted all appeals and other avenues of post-conviction relief in state and federal courts, or after that person, who is determined by this Court to be mentally competent, knowingly and voluntarily waives such appeals. *See In re Stays of Execution in Capital Cases,* 321 S.C. 544, 471 S.E.2d 140 (1996); *Roberts v. Moore,* 332 S.C. 488, 505 S.E.2d 593 (1998); S.C.Code Ann. § 17–25–370 (2003) and § 16–3–25 (2003). When considering a request by an appellant who has been sentenced to death to waive the right to appeal or pursue PCR, and to be executed forthwith, it has been our practice to remand the matter to circuit court for a hearing and ruling on whether the appellant is mentally competent to make such a waiver, and whether any waiver of appellate or PCR rights is knowing and voluntary. We remand such a matter when we deem it necessary to further develop or explore the facts of a case. Following that competency hearing, the parties are required by this Court to file briefs and an appendix containing the testimony and evidence considered by the circuit court. The appellant is required, when directed by the Court, to appear at oral argument and personally respond to questions regarding the waiver of his appellate or PCR rights. *See State v. Passaro,* 350 S.C. 499, 567 S.E.2d 862 (2002); *State v. Torrence,* 317 S.C. 45, 451 S.E.2d 883 (1994) (*Torrence II* ); *Singleton v. State,* 313 S.C. 75, 437 S.E.2d 53 (1993).

■ This procedure is necessary and appropriate because it provides the parties an opportunity to fully explore the issues and develop a record for our review. We are not bound by the circuit court's findings or rulings, although we recognize the circuit court judge, who saw and heard the witnesses, is in a better position to evaluate their credibility and assign comparative weight to their testimony. *Cf. Cherry v. Thomasson,* 276 S.C. 524, 280 S.E.2d 541 (1981). This matter is similar to one arising in our original jurisdiction because it is this Court which must finally determine whether a particular appellant is

mentally competent to make a knowing and voluntary waiver of his appellate or PCR rights. *Passaro*, 350 S.C. at 506, 567 S.E.2d at 866 ("Importantly, this Court is the final body to decide whether to grant [an appellant's] waiver."); *State v. Torrence*, 322 S.C. 475, 477 n. 2, 473 S.E.2d 703, 705 n. 2 (1996) (*Torrence III* ) (no appeal lies from the remand of case for fact finding on the issue of competency; such a case is similar to one arising in the Court's general jurisdiction in which the Court may provide for fact finding as necessary).

In deciding the issue of an appellant's competency, we carefully and thoroughly review the appellant's history of mental competency; the existence and present status of mental illness or disease suffered by the appellant, if any, as shown in the record of previous proceedings and in the competency hearing; the testimony and opinions of mental health experts who have examined the appellant; the findings of the circuit court which conducted a competency hearing; the arguments of counsel; and the appellant's demeanor and personal responses to our questions at oral argument regarding the waiver of appellate and PCR rights. *See Passaro*, 350 S.C. at 504–08, 567 S.E.2d at 865–67 (reviewing evidence presented at competency hearing, including testimony of mental health experts, as well as appellant's responses to Court's extensive questioning of him at oral argument, in concluding he was mentally competent to waive right to direct appeal and be executed); *Torrence III*, 322 S.C. 475, 473 S.E.2d 703 (after reviewing the record of a competency hearing in circuit court which included testimony from mental health experts and the record of the Court's prior questioning of appellant, Court concluded the record "overwhelmingly supports a determination that [appellant] is indeed competent" to knowingly and voluntarily waive his appellate rights and be executed); *Torrence II*, 317 S.C. 45, 451 S.E.2d 883 (where appellant wished to waive right to direct appeal, Court remanded case for circuit court to conduct a competency hearing "allowing the introduction of testimony, exhibits, and evidence, to provide a full record for this Court's evaluation"; Court questioned appellant personally about the waiver of his appellate rights and instructed circuit court to do the same); *Singleton*, 313 S.C. at 84, 437 S.E.2d at 58 (after reviewing record of competency hearing in circuit court which revealed, *inter alia*, the

appellant was completely unaware he would die in an electric chair and was able to give only yes-no answers to questions, Court concluded "[t]he record contains a wealth of evidence which supports the PCR judge's finding of incompetence" and thus appellant could not be executed). We necessarily decide each case on an individual basis, and it is within our discretion whether to allow an appellant to waive his appellate or PCR rights. *Passaro*, 350 S.C. at 506, 567 S.E.2d at 866.

## LAW AND ANALYSIS

### I. MENTAL COMPETENCY

Petitioner [1] contends the circuit court erred in ruling that he was mentally competent to waive his right to pursue PCR with counsel's assistance and that his waiver was knowing and voluntary. Petitioner argues his history of mental health problems, past and present evaluations by mental health professionals, and evidence at the most recent competency hearing support exactly the opposite conclusion—that he is not mentally competent to make a knowing and voluntary waiver of his right to pursue PCR. We agree.

The standard for determining whether an appellant or PCR applicant is mentally competent to waive the right to a direct appeal or PCR is set forth in *Singleton*, 313 S.C. 75, 437 S.E.2d 53:

> The first prong is the cognitive prong which can be defined as: whether a convicted defendant can understand the nature of the proceedings, what he or she was tried for, the reason for the punishment, or the nature of the punishment. The second prong is the assistance prong which can be defined as: whether the convicted defendant possesses sufficient capacity or ability to rationally communicate with counsel.

*Id.* at 83, 437 S.E.2d at 58; *accord Torrence II*, 317 S.C. 45, 451 S.E.2d 883. This standard of competency is the same

---

1. We recognize Petitioner personally disagrees with the arguments set forth by his attorney. Nevertheless, we will refer only to Petitioner (without distinguishing him from counsel) because he remains represented by counsel and the crucial issue is whether Petitioner has the mental capacity to waive his right to PCR and counsel, and make these decisions for himself.

standard required before a convicted defendant may be executed. *Torrence II*, 317 S.C. at 47, 451 S.E.2d at 884. The failure of either prong is sufficient to warrant a stay of execution and a denial of the convicted defendant's motion to waive his right to appeal or pursue PCR. *Singleton*, 313 S.C. at 83, 437 S.E.2d at 58.

The record sets forth Petitioner's mental health history from his arrest in 1992 until a competency hearing in 2002, as well as his pretrial murder of a cellmate by stabbing him to death during a psychotic episode in which he was deemed legally insane. The record shows Petitioner exhibited signs of schizophrenia since at least the murder of Officer McCants in 1992, and perhaps a few years earlier. He was first formally diagnosed with paranoid schizophrenia in 1994. Petitioner has experienced serious mental health problems for years, with sporadic treatment by medication and limited success in resolving them.

█ Petitioner was deemed legally competent to stand trial in 1994 by one examiner, then deemed incompetent by that same examiner and two others a short while later. He was ruled legally competent by the court to stand trial in 1995 while being forcibly medicated, but stopped voluntarily taking his medications after he was sentenced to death.[2] Examiners disagreed on whether Petitioner was competent in 2000, but court-appointed examiners found him to be incompetent to waive PCR in 2001. A continued hearing resulted in further disagreement over Petitioner's competence among mental health practitioners, but a finding of competence by the circuit court in 2002.

---

**2.** The State may not forcibly medicate an inmate solely to facilitate execution. An inmate has a right, grounded in the state constitutional right to privacy and the Fourteenth Amendment's Due Process clause of the federal constitution, to be free from unwanted medical intrusions. The State may forcibly medicate an inmate only when he is dangerous to himself or others, and then only when it is in the inmate's best medical interest. *Singleton*, 313 S.C. at 89, 437 S.E.2d at 61 (relying in part on *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) and *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)); *see also Ford v. Wainwright*, 477 U.S. 399, 418–27, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (holding, in plurality opinion, that the execution of an inmate who becomes incompetent or insane after conviction and sentencing is violative of the Eighth Amendment and due process) (Powell, J., concurring).

Petitioner stated he wished to waive PCR in 2000, then changed his mind and filed a PCR application. He again tried to waive PCR later in 2000, but again changed his mind and decided to pursue PCR in 2001. He expressed his wish for PCR at a hearing in 2002, then changed his mind and indicated a renewed desire to waive it.

At the most recent competency hearing in September 2004, held upon order of this Court, the circuit court considered the transcript of two commitment hearings before the probate court in 2003, the testimony and reports of several psychiatrists who examined Petitioner, and the testimony of Petitioner.

At the first probate court hearing in January 2003, the probate judge ordered the South Carolina Department of Corrections (DOC) to treat Petitioner at DOC's Gilliam Psychiatric Hospital instead of housing him at a maximum security prison. The probate court adhered to a previous order by the circuit court to forcibly medicate Petitioner only when deemed necessary on an emergency basis by DOC doctors and approved by Dr. Donna Schwartz–Watts, a private psychiatrist who has treated Petitioner for several years. Schwartz–Watts and Dr. Richard Ellison, a DOC psychiatrist, testified Petitioner suffers from paranoid schizophrenia. Petitioner has "bizarre thoughts about life and the afterlife," hallucinations, and delusions. Petitioner repeatedly flushed his clothes down the toilet and stood naked in his cell, smeared feces on the walls and himself, and postured bizarrely in his cell like a bodybuilder.

A Gilliam hospital social worker testified Petitioner was delusional. Petitioner stated he had exploded bombs in several rooms, he could tell time by using his pulse, and he planned to be released from prison before Christmas and go to the bus station.

The record is replete with evidence of the love-hate relationship Petitioner has with his appellate attorney, Teresa Norris. For example, Petitioner at this probate court hearing offered a rambling, hateful, profanity-laced diatribe against Norris, his doctors, and the courts. Petitioner accused Norris of representing him only to advance her career and said he has tried to fire her. Petitioner repeatedly denied he was incompetent

and said Norris's only goal is to have him declared incompetent to prevent his execution.

At the second probate court hearing in May 2003, the psychiatrists' testimony and result was much the same, with the probate court ordering Petitioner to be transferred again to Gilliam Psychiatric Hospital for treatment. Dr. Schwartz–Watts testified Petitioner was schizophrenic and severely mentally ill. The doctor and a DOC social worker testified Petitioner had stopped eating or bathing, refused medications, torn up several jumpsuits, stayed in a fetal position under his cot, and was generally unable to care for himself. While normally not violent, Petitioner can become extremely agitated and combative. Before the judge entered the courtroom at this hearing, Petitioner picked up the table while in handcuffs and had to be restrained by several officers. Dr. Schwartz–Watts testified Petitioner was trapped in an ever-deteriorating cycle of mental illness, taking medication and improving slightly, then going off medication and getting progressively worse. Dr. Schwartz–Watts testified that

> [h]e needs medication, but to get him well enough to even know what he would want when he's well, what kinds of medication he would need to be maintained on, we've never gotten to that point.
>
> I have never been to the point with [Petitioner] that I have been able to sit down and rationally understand what he wants because he's never been well long enough to be able to do that. He's so ambivalent, which is a symptom of schizophrenia. One week he wants to die. The next week he would want to go on with his legal proceedings.

At the competency hearing in September 2004, Drs. Jeffrey Musick, Pamela Crawford, and Margaret Melikian, psychiatrists employed by the South Carolina Department of Mental Health (DMH), all testified Petitioner was not competent under the *Singleton* standard.[3] The three psychiatrists diagnosed Petitioner as suffering from undifferentiated schizophrenia, which is believed to be caused by a chemical imba-

---

3. Dr. Pratap Narayan, a DMH psychiatrist, offered similar testimony about Petitioner's statements and actions, but declined to offer an opinion on whether Petitioner was competent under the *Singleton* standard.

lance in the brain. The characteristic symptoms of this major mental illness are delusions, hallucinations, disorganization of speech and thoughts, and disorganization of behavior.

In applying the *Singleton* analysis, the three psychiatrists testified Petitioner understands factually that he was tried for the murder of a police officer. Petitioner seemed to understand the reason for the punishment, *i.e.,* that he murdered someone, although he also asserted racial bias and the State's wish to dissect his superior physical body as reasons for his punishment.

The three psychiatrists testified Petitioner does not understand the nature of a PCR proceeding or the nature of the punishment. In perhaps the most significant and serious deficiency, they concluded Petitioner does not possess sufficient capacity or ability to rationally communicate with his lawyer.

The three psychiatrists testified Petitioner does not believe he is mentally ill, but sane and rational. However, their examinations revealed he is actively psychotic, suffering from visual and auditory hallucinations, delusions, and an inability to engage in organized speech or thought. His conversations usually are incoherent, with occasional, seemingly rational comments dominated by unintelligible, wildly divergent, and irrelevant dialogue peppered with made-up words and references to non-existent places. The psychiatrists offered the following examples of delusions, hallucinations, and disorganized speech, thoughts, and behavior by Petitioner:

Petitioner discussed something he called "hesitancy," then in an incoherent monologue in which he moved to different topics in rapid succession, he discussed movies; Gandhi; "Tel–Avery," which he said was the world's largest city; the equinox; the Tropic of Cancer; Venus Solaris; the synthetic god; the human god; the flesh god; and the cloth god.

Petitioner described himself as a world-class athlete who once could run 300 miles a week. One reason the State wants to put him to death is to dissect his body to discover the reason for his athletic prowess.

Petitioner said he has an intelligence quotient, or IQ, of 172; he also stated this fact to the judge at the 2004 competency hearing.[4]

Petitioner refused to discuss what happens in a PCR proceeding, saying only that he had waived it and had no further comment. He did, however, assert that the number of hours in his day, of which there are thirty-six or thirty-eight, will affect the PCR proceeding. Other people's days contain only twelve hours.

Petitioner said there is no afterlife, but then said he would be transformed into an "eternal force."

Petitioner said some people prepare for death by taking flu shots, although he is not one of them.

Petitioner said medications are administered by white people to black people, particularly young black males, in order to control or incapacitate them.

Petitioner has episodes in which he tears up his clothes and blankets, smears feces on the walls of his cell in patterns, bangs on his door, jumps on his bed, refuses to eat, speak, or bathe, and believes the staff is poisoning his food.

Petitioner said the FBI runs a concentration camp at the prison.

Petitioner said he passes through time zones. He often is fixated on numbers and the "hundreds of millions" of suns whose sunbeams awake unsuspecting women. He believes "forces" enter and depart from his prison cell. The forces awarded him "black diamonds" in his eyes, but took those away because he did not deserve them. The forces instead gave him "blue rings" in his eyes, which he insisted on asking psychiatrists to examine by leaning forward and asking, "Can you see them?" The forces were responsible for removing a building from the prison grounds. The forces have offered him 100 million years of life, but he turned them down in a respectful manner.

Petitioner said he wrote to former Secretary of State Madeline Albright at 1600 Pennsylvania Avenue because he must communicate through her in order to convince the Supreme Court he is competent.

---

4. An IQ between 90 and 110 is considered average. *See* http://www.bartleby.com/59/17/intelligence.html.

Petitioner stated that a major participant in a PCR proceeding is the "notary republic," which he defined as a "validated clerk that goes state to state and fills different positions." A new "notary republic" must be chosen to serve in his case because the licenses of all "notary republics" around the world will expire this year.

Petitioner said death means death, but seconds later asserted he has been granted five million years of life.

Petitioner said Judge Short told him that his mother was a whore during the first competency hearing in 2002.

Petitioner said he is being punished because he owns the state of South Carolina and the State wants to confiscate his wealth. He further asserted he made $56 million the previous week.

Petitioner said he is a god and described jousting with other gods.

Petitioner's testimony at the hearing is informative only because it reinforces the psychiatrists' diagnoses and opinions. Petitioner left the courtroom as the hearing began, upset that his usual guardian was not present and railing against "crackers" who are bent on medicating him against his will. He later returned.

Neither the State's attorney nor Judge Burch was able to elicit coherent or rational responses from Petitioner, including repeated questions about the nature of a PCR proceeding. Petitioner brushed aside questions and, in profanity-laced statements, asserted he was a "sane, rational individual" who "you white folks always want to medicate me on drugs down here." He told examiners "I am no donor and wish to be electrocuted," "you don't like the fact that I'm no donor. I ain't going to be no donor." [5] He stated he wanted to be executed by electrocution, complained that he had done his "legal four hours in chains," and repeatedly asked to be taken back to his cell.

At his appearance before this Court, Petitioner answered most of our questions calmly and politely. Attorneys involved

---

**5.** Melikian testified that by using the term "donor," Petitioner probably was referring to his desire that the State not dissect his body to discover the reasons for his purported athletic prowess.

with his case for several years stated they were surprised by Petitioner's restrained demeanor. Petitioner chose not to remain in the courtroom to hear the attorneys' oral arguments, but was returned to Gilliam Psychiatric Hospital, where he has been incarcerated for 2 ½ years.

Petitioner testified he is not mentally ill, but merely withdrawn or voluntarily silent because he has been isolated in a cell by himself for years. He expressed his wish to die by electrocution and testified that death means the brain and other bodily organs cease to function. Respondent testified he occasionally takes "Geodorn," which he described as a mild sedative which helps him sleep, but he has not taken it in about week.[6]

Petitioner often responded with yes-no answers when asked about the nature of various rights he would be waiving and the consequences of his waiver. When asked to elaborate on an answer in his own words, Petitioner's responses revealed a distinct lack of understanding of the PCR process, substantial confusion about his appellate rights, and disorganized thought patterns. The following exchanges during the questioning of Petitioner by Chief Justice Toal are instructive:

Q: Do you understand what a post conviction relief proceeding is?

A: Yes, I do.

Q: Do you understand what happens in a post conviction relief proceeding?

A: Yes. Yes, I do.

Q: Has your attorney explained to you what happens in a post conviction relief proceeding?

A: She has several times.

Q: And do you understand what your attorney has told you about that?

A: I pretty much have taken it in. I pretty much have taken it in.

Q: Tell me in your own words, Mr. Hughes, what happens in a post conviction relief proceeding.

---

**6.** Petitioner apparently meant "Geodon," the brand name of ziprasidone, an anti-psychotic medication used to treat schizophrenia. *See Physicians Desk Reference* 2688–89 (2002).

A: That means that I can take up the terms and the amendments that's being held before me to take and perceive the law, as in perceivance.

. . .

Q: All right, sir. Do you realize that by waiving your right to post conviction relief, you may be jeopardizing any habeas corpus relief that would be available to you in a federal court?

A: Well, I'm not jeopardizing the habeas corpus law because the Mecklenburg County Jail, when they took and gave me ten years for grand theft auto larceny, they took and convened the court then. They took and changed the jurisdiction, so that's under habeas corpus law. They've already taken and did that, so I'm not under habeas corpus law.

The state of North Carolina willingly did take in and get with the legal system down here in that matter of conveyance.

. . .

Q: Now, do you believe you received a fair trial, Mr. Hughes?

A: Well, it's not to my belief in the law or the legal system. As far as to merit, when I took and did my first summary, when I did my procumfactories (phonetic) all the way down to the final summary, in point factory—the case in factory, the court didn't have any evidence against me. When the court didn't have any evidence against me, they showed me what their attitude was all about.

Q: All right, sir.

A: The court showed me, first of all, that on its legal terms, that they did not respect my ability to think. When I took and did my summary, it wasn't that they took in a sorry day of intelligence, it's just the fact that they didn't have any case against me.

As I have stated over the years and stuff, being that I'm a person of my own degree, that means I'm a person of my own understanding, it's not that I have a problem with my conscience because my conscience does not deal with me—deal with me pertaining to this case.

I said when I had went into the courtroom, the court, first of all, made like it was an understanding as far as to what was presented on the record, and what was presented on the record, they could not have found me guilty.

Again as I stated, over the years since I have been incarcerated, I said that to myself, if they did come up, well, the cases in fact raise or misses in point they had to convict me to have a life sentence, I still would have to have did (sic) about 30 or 40 years.

If it had been a migrating (sic) circumstance, it still would have been the points that might have happened inside of this state, but as far as dealing with other people's backgrounds, other people's attitudes, like I said, I have always been a person who did solitary time. I was being in segregated law.

As far as for incarcerated time, I'll always be in segregation, other than the fact that when I had took (sic) and went to North Carolina, they have—you know, being incarcerated, segregated, as I said, they did not take and value what I put down on paper. On those conditions there, I told judge Burch that I was guilty on those conditions there.

Q: I understand. I understand, Mr. Hughes.

A: So it doesn't have anything to do with legal phasing as to innocent or guilt. It didn't have anything to do with that. I'm saying it had went through this court system here about four years ago one time before when I had took and brought the procedure about six years ago to be executed.

As I have stated, I've been waiting over six years now in my own room to be executed. I have been waiting six years to be executed. Do you understand? I haven't been just sitting here thinking about being executed for no reason. I've been waiting six years to be executed with finality.

Q: All right, sir.

A: In the courtroom decision back then, when they took and changed the legal law, the public back then, because she had an expired commission, I think it was every four years. That was the first setback that I had took and went through.

Other than that, if I didn't give you a runaroundstory, it was just to this fact here. When I had went through the

courtroom through the preliminary hearings in North—I mean, not North Carolina but in York County close to North Carolina, they did not take and listen to what was presented in the case. They just presented their case.

I offered those things right there. I took and formed my own opinion about the state of South Carolina, but I have never came to the courtroom as showing a negative attitude. I never did that, even though my attitude is negative toward the court system.

Petitioner's mention of a "public back then," a "she" who had an "expired commission," appears to be a reference to what he previously has described as a "notary republic," a person whom Petitioner has told psychiatrists is a major participant in a PCR proceeding. In addition, Petitioner twice told us that he has written to former Secretary of State Madeline Albright, whom he previously has indicated wields some influence over our resolution of his case.

We have carefully and thoroughly reviewed Petitioner's history of mental competency, as well as his history of mental illness as shown in the record of previous proceedings and in the last competency hearing. We have considered the testimony of the mental health experts who examined Petitioner. We have reviewed the findings of the circuit court and weighed the arguments of counsel for the parties, and we have considered Petitioner's demeanor and personal responses to our questions at oral argument regarding the waiver of his rights. We recognize, of course, that questions of mental competence, unlike issues of historical fact, call for a basically subjective judgment. "And unlike the determination of whether the death penalty is appropriate in a particular case, the competency determination depends substantially on expert analysis in a discipline fraught with subtleties and nuances." *Ford v. Wainwright,* 477 U.S. 399, 426, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (Powell, J., concurring) (quotes omitted).

We acknowledge the issue of Petitioner's mental competence is not immutable. A determination of mental competence may change from one period of time to another, particularly when the administration of medication or treatment, or the lack thereof, may affect a person's mental faculties. *See e.g. Walton v. Angelone,* 321 F.3d 442, 459 (4th Cir.2003)

("Even if a defendant is mentally competent at the beginning of the trial, the trial court must continually be alert for changes which would suggest that he is no longer competent."); *Hunter v. State,* 660 So.2d 244, 248 (Fla.1995) (once a defendant is determined competent to stand trial, a presumption of competence attaches to the defendant in later proceedings; however, another competency hearing is required if a bona fide question about the defendant's competency is raised); *see also Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (information concerning defendant's suicide attempt during trial, when considered with psychiatric information available prior to trial and wife's testimony concerning his "strange behavior" and his attempt to kill her shortly before trial, created sufficient doubt of defendant's competence to stand trial so as to require further inquiry on the issue).

We conclude that, pursuant to the *Singleton* standard, Petitioner is not mentally competent at this time to waive the right to pursue PCR. Petitioner apparently understands what he was tried for and the reason for his punishment; whether he understands the nature of the punishment is less certain. However, it is clear he does not understand the nature of the PCR proceeding which he wishes to waive the right to pursue. Petitioner was not able to describe, in a reasonably coherent fashion using layman's terms, the basic purposes or procedures available to him in PCR, either in the court below or in this Court. Thus, the cognitive prong of the *Singleton* analysis has not been satisfied.

We further conclude the assistance prong is not satisfied on this record. We are not persuaded Petitioner possesses sufficient capacity or ability to rationally communicate with counsel. We agree with the mental health experts who examined Petitioner, and who cited his inability to communicate adequately with counsel as a primary reason for their conclusion he was not mentally competent. Given our conclusions, it is not necessary to reach the issue of whether any waiver was knowing and voluntary.

In a second argument, Petitioner asserts that, even if he were deemed mentally competent, the Eighth Amendment proscription against cruel and unusual punishment and inter-

national law prohibit the execution of a chronically mentally ill person. We find it unnecessary to address this argument in light of our disposition of this matter. *See Whiteside v. Cherokee County School Dist. No. One,* 311 S.C. 335, 340, 428 S.E.2d 886, 889 (1993) (appellate court need not address remaining issue when resolution of prior issue is dispositive).

## CONCLUSION

We conclude Petitioner is not mentally competent, pursuant to the *Singleton* standard, to waive the right to pursue PCR and be executed forthwith. We remand this case to circuit court for further proceedings pursuant to *Council v. Catoe,* 359 S.C. 120, 597 S.E.2d 782 (2004).

**REMANDED.**

MOORE, WALLER, and PLEICONES, J.J., concur.
TOAL, C.J., dissenting in a separate opinion.

Chief Justice TOAL:

I respectfully dissent. In my opinion, Hughes is competent to waive his right to pursue PCR. I disagree with the majority's cherry-picking of the transcript and record. Throughout this proceeding Hughes has demonstrated an ability to understand the impact of his decisions and, in my opinion, did so in his appearance before this Court.

Further, in the interest of judicial economy, I would allow Hughes to waive his right to PCR. In my view, allowing Hughes to waive his right to PCR would result in the case arriving at the exact same procedural posture as is now. Ultimately, the majority's decision will force the case to go full circle and eventually require a thorough evaluation to determine if Hughes is competent to be executed. As a result, after the Order for Execution is issued, counsel for Hughes could apply for subsequent PCR relief pursuant to *Singleton,* which is the final judicial safeguard against executing someone not mentally competent. *Singleton,* 313 S.C. 75, 87, 437 S.E.2d 53, 60 (1993) (stating that apply § 17–27–20 is the final judicial safeguard for a stay of execution to evaluation a defendants competency and immediate review by this Court is permitted if the defendant is found competent by the PCR

court); S.C.Code Ann. § 17–27–20(a)(6) (stating that a defendant may apply relief upon any ground of alleged error). The decision of the majority adds an additional step, one that Hughes has requested that he be allowed to waive.