670 S.E.2d 356

**Donney S. COUNCIL, a/k/a Donnie S. Council, Respondent,**

v.

**STATE of South Carolina, Petitioner.**

No. 26543.

Supreme Court of South Carolina.

Heard June 26, 2008.

Re-filed Dec. 29, 2008.

Rehearing Denied Dec. 29, 2008.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka and Assistant Attorney General Melody J. Brown, all of Columbia, for Petitioner.

Teresa L. Norris, of Blume, Weyble & Norris, of Columbia, Theresa Lee Clement, of Clement Law Office, of Columbia, for Respondent.

Justice BEATTY:

In this death penalty post-conviction relief (PCR) case, the Court granted the State's petition for a writ of certiorari to review the PCR judge's decision to: vacate Donney S. Council's (Respondent's) sentence of death; grant a new hearing for the penalty phase of his capital murder trial; and continue indefinitely one of his PCR grounds until Respondent regained competence. After we issued our original opinion affirming in part, reversing in part, and remanding for a new sentencing hearing, the State petitioned for rehearing. We deny the petition for rehearing, withdraw our original opinion, and substitute it with this opinion which revises footnote number seven.

## FACTUAL/PROCEDURAL HISTORY

On the evening of October 9, 1992, police discovered the body of seventy-two-year-old Elizabeth Gatti underneath a bedspread in her basement. She had been hogtied with a white cord and layers of duct tape were wrapped around her entire head. Her clothes had been ripped, and the crotch of her underwear had been cut out. Surrounding her body were various bottles of cleaning fluids which she had been forced to ingest. Mrs. Gatti had been sexually assaulted as evidenced by a gaping laceration extending from her vagina into the rectal area.

Respondent was arrested for the crimes on October 12, 1992. In two separate statements, Respondent admitted to being in Mrs. Gatti's house on the night she was killed and that he had sex with her. However, he denied committing the murder and implicated a man named "Frankie J," who Respondent alleged was present with him at the time of the crime. "Frankie J" was later identified as Frank Douglas. None of the physical evidence found in Mrs. Gatti's house or in her car matched Douglas.

Because Respondent admitted to being in Mrs. Gatti's home when the crime took place, trial counsel pursued the theory that Respondent did not murder Mrs. Gatti but was merely present at the time of the crime. The jury found Respondent guilty of murder, administering poison, first-degree burglary, grand larceny of a motor vehicle, petty larceny, kidnapping, and two counts of first-degree criminal sexual conduct (CSC).

Prior to the beginning of the penalty phase, trial counsel moved to allow into evidence the results of Frank Douglas' polygraph test which indicated deception. Trial counsel sought to present this evidence to the jury in an effort to establish that Douglas was the actual perpetrator and Respondent was merely present at the time of the crime.[1] The trial judge declined to admit the polygraph test.

As part of its case, the State called several witnesses to testify regarding Respondent's juvenile and adult records as well as his numerous disciplinary problems while incarcerated for these offenses at the Department of Juvenile Justice (DJJ) and the Department of Corrections (DOC). The testimony established that Respondent entered the DJJ system at ten years old with his adult criminal activity escalating to more violent offenses which included resisting arrest, assault and battery with intent to kill, and armed robbery. After outlining Respondent's prior record, the State offered testimony to establish the aggravating circumstances surrounding Mrs. Gatti's murder.

---

1. Counsel contended the polygraph test was relevant to establish the following two statutory mitigating circumstances: (1) Respondent was an accomplice in the murder committed by another person and his participation was relatively minor; and (2) Respondent acted under duress or under the domination of the other person. S.C.Code Ann. § 16-3-20(C)(b)(4), (5) (1985).

In response, trial counsel offered Respondent's mother, Betty Council, as the sole defense witness. She told the jury that Respondent is the youngest of ten children. She testified she took Respondent to "mental health" between the ages of seven and fourteen and that he had been teased as a child while at school. She also showed the jury a childhood picture of Respondent. Respondent's mother further testified that Respondent suffered third-degree burns from a cooking accident, and that the treating physician told her that it would "take effect" on Respondent. In terms of Respondent's adulthood, Respondent's mother testified that he has two young sons. When asked by defense counsel what she would do as Respondent's mother when faced with the jury's decision as to life without parole or death, she pleaded for the jury to impose a life sentence.

The jury found beyond a reasonable doubt that the murder was committed in the commission of the following aggravating circumstances: criminal sexual conduct; kidnapping; burglary; larceny with the use of a deadly weapon; killing by poison; and physical torture. As a result, the jury recommended Respondent be sentenced to death. The trial judge denied all of Respondent's post-trial motions and ordered Respondent to be put to death on December 6, 1996.

On appeal, this Court affirmed Respondent's convictions and sentences. *State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999). After the United States Supreme Court denied Respondent's petition for a writ of certiorari,[2] he petitioned this Court for a stay of execution to pursue state PCR remedies.

Following this Court's grant of the stay, Respondent filed his initial PCR application. Shortly thereafter, Respondent indicated that he wished to withdraw his PCR application and be executed. Pursuant to this request, a hearing was held before the circuit court on December 8, 2000. As a result of this hearing, the circuit court judge ordered a competency evaluation of Respondent. Three months later, the Department of Mental Health found that Respondent was not competent to waive PCR or be executed because he suffered from

---

2. *Council v. South Carolina*, 528 U.S. 1050, 120 S.Ct. 588, 145 L.Ed.2d 489 (1999).

schizophrenia, undifferentiated type. Respondent's PCR counsel then moved to stay the PCR proceedings.

After a hearing, a circuit court judge ordered the capital PCR proceedings to be stayed indefinitely due to Respondent's incompetence. The State petitioned for and was granted certiorari by this Court to review the circuit court's order. This Court set aside the stay and ordered the PCR proceedings to continue. *Council v. Catoe*, 359 S.C. 120, 597 S.E.2d 782 (2004).

Following this Court's decision, Respondent filed two amended applications. In his final application, Respondent alleged he was entitled to relief based on the following grounds: ineffective assistance of counsel during voir dire and jury selection; ineffective assistance of counsel during the sentencing phase for: (i) failing to obtain a mitigation investigator or to otherwise adequately prepare and present powerful mitigating evidence; (ii) failing to develop a consistent, credible theme for a sentence of life imprisonment; (iii) failing to obtain the assistance of a pathologist and failing to challenge the testimony of the State's expert pathologist regarding the circumstances surrounding Mrs. Gatti's death; Respondent may not be executed because he is incompetent; ineffective assistance of counsel in investigating Respondent's competency to stand trial; and ineffective assistance of counsel in investigating Respondent's mental state at the time of the offenses.

At the hearing, PCR counsel called Respondent as a witness. However, due to his incompetence, Respondent was essentially unintelligible in his testimony. As a second witness, PCR counsel called Dr. Tora Brawley, a clinical neuropsychologist who reviewed Respondent's records and interviewed several of his family members. Based on the results of a battery of tests, Dr. Brawley believed there was evidence of brain dysfunction, particularly in the frontal lobe. Dr. Brawley testified Respondent began having problems when he was seven years old. Although Respondent had an I.Q. of 106 at that time, he was diagnosed with a learning disability and enrolled in special education classes. When Respondent was tested again at ten years old, his I.Q. had dropped approximately twenty-three points. In Dr. Brawley's opinion, this

significant decrease represented an overall decline in general cognitive functioning.

Next, PCR counsel called Marjorie Hammock a forensic social worker who compiled a "social family history" for Respondent. Based on her investigation, Hammock found that several of Respondent's family members suffered from mental illness, were involved in criminal activity, and have "significant educational deficit problems." Hammock also discovered that Respondent's father was an alcoholic who was extremely violent. Divorce records indicated Respondent's mother was granted a divorce on the ground of physical cruelty. After the father left the home, Respondent's family moved at least seven times from one bad neighborhood to another and lived in several homes which did not have running water and indoor plumbing. The family members also depended on government assistance for their financial existence. Respondent's individual records revealed that he: failed the first, seventh, and ninth grades; suffered two head injuries prior to the age of ten years old; suffered a burn injury which occurred when he was cooking without adult supervision at age seven; was treated at seven or eight years old for nervousness, sleepwalking, and nightmares at the local mental health center; and had attempted suicide.

The next witness called by PCR counsel was Dr. Donna Schwartz–Watts, a forensic psychiatrist who began evaluating Respondent in the summer of 1999. At that time, she believed Respondent was acutely psychotic and unable to assist his appellate counsel due to his "paranoid ideation" and "delusions of grandeur." In 2001, Dr. Schwartz–Watts conducted an additional evaluation of Respondent in preparation for a competency hearing. Dr. Schwartz–Watts diagnosed Respondent with "undifferentiated schizophrenia," which she believed began in early adolescence or childhood.

In its case, the State called James Whittle, Jr., Respondent's lead trial counsel. In terms of trial preparation, Whittle testified he filed pre-trial motions seeking the following records: DJJ records; school records; state mental health records, as well as Respondent's family's DSS records; and records from the vocational school attended by Respondent. Whittle turned the records he obtained over to Dr. Everett

Kuglar, a forensic psychiatrist who was court-appointed on August 8, 1995, for his evaluation of Respondent. Although Dr. Kuglar reviewed these records, trial counsel decided not to call him as a witness because he believed the State's cross-examination would have hurt the case.

In terms of compiling additional mitigation evidence, Whittle met with several of Respondent's family members. However, Whittle testified they did not offer anything that could be used in mitigation. Additionally, Whittle filed a motion seeking authorization and funding approval for a social history investigator to aid in preparing mitigation evidence. After receiving all of the requested records through the efforts of his investigator and law partner, Whittle decided not to procure a social history investigator even though funding had been approved.

Instead of offering social history evidence, Whittle focused on presenting the defense theory that Respondent did not participate in the murder but was merely present when Douglas committed the murder. Whittle believed the strongest mitigating evidence was Respondent's statement that he was not the perpetrator, the presence of another individual's DNA evidence at the scene, and Douglas' polygraph test which indicated deception. Based on this theory, Whittle testified he wanted to be consistent throughout the guilt phase and the penalty phase and that "it was basically an all-or-nothing approach." Because he believed the trial judge's decision not to admit Douglas' polygraph results limited what he could do in mitigation, Whittle decided to only call Respondent's mother as a witness.

In his deposition, Dr. Kuglar testified he was court appointed in August 1995, but did not meet with Respondent until September 1996 when Whittle scheduled the first meeting. He stated the only records he received were Respondent's incomplete high school records and the state mental hospital records from 1992–93. Dr. Kuglar testified that he met with Respondent for the specific purpose of evaluating Respondent's mental competency and criminal responsibility. Additionally, Dr. Kuglar testified that although he met with several members of Respondent's family, the interviews were not "very satisfactory of getting anything."

The PCR judge partially denied Respondent's application for relief, finding trial counsel was not ineffective: (1) during voir dire and jury selection; and (2) during sentencing for failing to develop a credible theme, failing to obtain an independent pathologist, and failing to investigate whether Respondent was mentally competent to stand trial.

The PCR judge granted Respondent relief, finding trial counsel's conduct was both deficient and prejudicial during the penalty phase of the trial in that he failed to adequately prepare and present evidence in mitigation. Relying extensively on the United States Supreme Court's opinion in *Wiggins*,[3] the judge found trial counsel was deficient in failing to obtain Respondent's background records prior to the beginning of trial. The judge also found that trial counsel neglected to pursue Respondent's earlier childhood records even though mental health records revealed that Respondent had a significant drop in I.Q. between the ages of seven and ten and had been medicated to "settle his nerves" during this time period. Additionally, the judge found trial counsel "unreasonably failed to expand the investigation to include obtaining records of [Respondent's] immediate family members" and to conduct more than just "limited" interviews with Respondent's family. The PCR judge also found trial counsel's conduct regarding Dr. Kuglar was unreasonable given trial counsel failed to provide him with adequate records and only asked him to examine Respondent with respect to the issues of competency to stand trial and his criminal responsibility or capacity at the time of the offenses.

The judge concluded this deficient conduct was prejudicial to Respondent, stating "[i]f counsel had adequately investigated and presented the available mitigation evidence, the jury would have heard substantial evidence in mitigation which was presented by [Respondent] in the PCR hearing." Ultimately, the PCR judge set aside Respondent's death sentence and ordered a new sentencing trial.

As to Respondent's remaining grounds, the judge ruled the allegation that Respondent should not be executed because he is incompetent was not ripe for consideration. The judge

---

3. *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

found that even though Respondent was incompetent under the standards of *Singleton*[4] the issue would not be procedurally proper until execution was imminent. Moreover, given his decision to set aside Respondent's death sentence, the judge concluded that no remedy was necessary. Finally, the judge held the allegation that Respondent was incompetent at the time of the offenses and trial counsel was ineffective for failing to adequately investigate Respondent's mental state should be continued until such time as Respondent regains competence.

The State petitioned for and was granted certiorari by this Court to consider the PCR judge's decision to vacate Respondent's death sentence and to grant a continuance as to whether trial counsel was ineffective in failing to adequately investigate Respondent's mental state at the time of the offenses.

## DISCUSSION

### I.

The State argues the PCR judge erred in finding trial counsel was ineffective in failing to investigate and present mitigation evidence. We disagree.

In a PCR proceeding, the applicant bears the burden of establishing that he is entitled to relief. *Caprood v. State,* 338 S.C. 103, 109, 525 S.E.2d 514, 517 (2000). In order to prove that counsel was ineffective, the PCR applicant must show that: (1) counsels performance was deficient; and (2) there is a reasonable probability that, but for counsels errors, the result of the trial would have been different. *Id.* (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). We will uphold the findings of the PCR court when there is any evidence of probative value to support them, and will reverse the decision of the PCR court when it is controlled by an error of law. *Suber v. State,* 371 S.C. 554, 558–59, 640 S.E.2d 884, 886 (2007).

Although the State admits that trial counsel did not obtain all records for Respondents immediate family, it asserts

---

4. In *Singleton v. State,* 313 S.C. 75, 437 S.E.2d 53 (1993), this Court adopted a two-prong analysis to determine a convicted defendant's competency to be executed.

trial counsel adequately investigated Respondents background and was aware of his disadvantaged background, learning disabilities, family turmoil, his siblings criminal activities, his prior record, and his drug use. In light of trial counsels investigation, the State avers there is no evidence to support the PCR judges ruling because trial counsel made an informed, strategic decision to omit certain mitigating evidence in an effort to present a consistent theory that Respondent was present but did not participate in Mrs. Gattis murder. Even if trial counsels conduct is found to have been deficient, the State asserts Respondent failed to establish that he was prejudiced.

As will be more fully discussed, we hold the PCR judge correctly determined that trial counsel was ineffective in failing to adequately investigate and present mitigating evidence.

Initially, we believe the PCR judge properly relied on the United States Supreme Courts decision in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In *Wiggins*, the defendant was tried and convicted for capital murder before a judge. After his conviction, the defendant elected to be sentenced by a jury. *Id.* at 515, 123 S.Ct. 2527. In a pre-sentencing motion, defendants counsel sought to bifurcate the proceedings so that he could first present his theory that the defendant did not act as the principal in killing the victim. Counsel then intended to present a mitigation case. After this motion was denied, the sentencing proceeding commenced immediately. Although counsel made a general reference to the defendants difficult life, counsel did not present any evidence of the defendants life history. The jury sentenced Wiggins to death. On appeal, Wiggins convictions and sentences were affirmed. *Id.* at 516, 123 S.Ct. 2527.

Subsequently, Wiggins filed an application for post-conviction relief, alleging his trial attorneys had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background. *Id.* at 516, 123 S.Ct. 2527. After he exhausted his state PCR remedies, Wiggins filed a petition for habeas corpus in federal district court. The federal courts grant of relief was reversed by the Fourth Circuit, which held that Wiggins trial counsel

made a reasonable strategic decision to focus on petitioners direct responsibility. *Id.* at 519, 123 S.Ct. 2527.

The United States Supreme Court granted certiorari and reversed the Fourth Circuits decision. The Supreme Court found trial counsel was ineffective in failing to adequately prepare and present mitigating evidence. Although trial counsel obtained a pre-sentencing investigation report and DSS records, which revealed Wiggins tumultuous childhood and low I.Q., counsel failed to investigate further. Counsel also chose not to retain a forensic social worker despite the fact that funds were made available to commission a social history report. *Id.* at 524, 123 S.Ct. 2527. The Court found counsels decision not to expand their investigation beyond the retained records was unreasonable given it fell short of professional state standards and the American Bar Association standards governing capital defense work. *Id.*

The Court also determined that counsels performance prejudiced Wiggins. Specifically, the Court found that had trial counsel further investigated they would have discovered the following powerful mitigating evidence: Wiggins was abused by his alcoholic mother during the first six years of his life; he suffered physical and sexual abuse while in foster care; he was homeless at times; and suffered from diminished mental capacities. *Id.* at 535, 123 S.Ct. 2527. Given the strength of the mitigating evidence, the Court believed there was a reasonable probability that the jury would have returned a different sentence had they been presented with this evidence. *Id.* Not only did the Court find that it was unreasonable for counsel not to investigate and present this mitigating evidence, it also rejected counsels assertion that the omission of the evidence constituted a trial strategy.

In recent decisions, this Court has adhered to the principles and analysis in *Wiggins* in determining whether counsel was ineffective in failing to thoroughly investigate potential guilt and penalty phase evidence. *See Ard v. Catoe,* 372 S.C. 318, 332 n. 14, 642 S.E.2d 590, 597 n. 14 (2007), *cert. denied, Ozmint v. Ard,* — U.S. —, 128 S.Ct. 370, 169 L.Ed.2d 247 (2007) (referencing *Wiggins* and affirming PCR courts decision finding trial counsel ineffective in failing to further investigate gunshot residue evidence in capital murder case);

*Nance v. Ozmint,* 367 S.C. 547, 557 n. 8, 626 S.E.2d 878, 883 n. 8 (2006), *cert. denied,* 549 U.S. 943, 127 S.Ct. 131, 166 L.Ed.2d 253 (2006) (noting the holding in *Wiggins* and concluding defense counsel in capital murder case should have, among other things, investigated and presented evidence of defendants adaptability to confinement and presented mitigating social history evidence outlining defendants troubled childhood and mental illness); *Von Dohlen v. State,* 360 S.C. 598, 606–07, 602 S.E.2d 738, 742–43 (2004), *cert. denied,* 544 U.S. 943, 125 S.Ct. 1645, 161 L.Ed.2d 511 (2005) (concluding case was sufficiently analogous to *Wiggins* and holding that trial counsel in capital murder case was ineffective in failing to adequately prepare and present evidence in the penalty phase that defendant suffered from severe, chronic depression at the time of the murder given trial counsel failed to provide expert witness with crucial medical records and related information which prevented witness from conveying an accurate diagnosis of defendants mental condition to the jury).

Applying the foregoing to the facts of the instant case, we find the PCR judge correctly relied on *Wiggins* and there is evidence to support his finding that Respondents trial counsel was deficient in failing to sufficiently investigate and present mitigating evidence.

We believe it was unreasonable for trial counsel not to further investigate Respondents background and present even the minimal mitigating evidence that was obtained. Initially, trial counsel was deficient in not beginning his investigation into Respondents background once the State served its notice of intent to seek the death penalty, counsel discovered that Respondents DNA was found at the scene of the crime, and counsel learned of Respondents inculpatory statements to police indicating that he sexually assaulted the victim. Clearly, counsel should have been aware that the defense accomplice theory was not that strong and that mitigation evidence was the only means of influencing the jury to recommend a life sentence. Yet, despite this knowledge, trial counsel: only obtained the DJJ and state hospital records before trial; did not request certain background records until the day of jury selection; did not set up a meeting between Dr. Kuglar and Respondent until one month before trial; and provided Dr. Kuglar with only limited records. As in *Wiggins,* counsels

conduct fell below the standards set by the ABA. *See American Bar Association Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases,* 11.4.1(2)(C) (1989) (once counsel is appointed in any case in which the death penalty is a possible punishment, he or she should begin, among other things, collecting information relevant to the sentencing phase including, but not limited to: medical history, educational history, family and social history, and prior adult and juvenile record).[5]

Even the limited information obtained should have put counsel on notice that Respondents background, with additional investigation, could potentially yield powerful mitigating evidence. *See Williams v. Taylor,* 529 U.S. 362, 398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Mitigating evidence unrelated to dangerousness may alter the jurys selection of penalty, even if it does not undermine or rebut the prosecutions death-eligibility case.); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (stating that mitigating evidence includes any aspect of a defendants character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death); *see also* Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U. L.Rev. 299, 317–339 (1983) (discussing counsels preparation of and impact of mitigating evidence in capital cases).

However, not only did counsel delay in investigating Respondents background, he failed to conduct an adequate investigation. Significantly, he failed to provide his only expert witness, Dr. Kuglar, with sufficient records and only directed him to evaluate Respondents competency to stand trial and criminal responsibility. Additionally, Dr. Kuglar, at the direction of counsel, only met with Respondent on two occasions, the first being shortly before trial.

Furthermore, even though the funding was available, trial counsel chose not to hire a social history investigator. Instead, he relied on his law partner and private investigator to collect potentially relevant information. However, neither of

---

5. We note that these guidelines were revised in 2003. However, we cite to the 1989 guidelines given they were in effect at the time of Council's trial.

these individuals was qualified, in terms of social work experience, to evaluate the information to assess Respondents background.

Finally, we believe it was unreasonable for trial counsel not to obtain Respondents family records. First, it is inexplicable that trial counsel deemed these records unimportant because they did not directly involve Respondent. *See Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (stating evidence about the defendants background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)(OConnor, J., concurring))), *abrogated by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding executions of mentally retarded criminals constituted cruel and unusual punishments prohibited by the Eighth Amendment); *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation.); *American Bar Association Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases*, 11.8.3(F)(1) (1989) (in preparing for the sentencing phase, trial counsel should consider investigating [w]itnesses familiar with and evidence relating to the clients life and development, from birth to the time of sentencing, who would be favorable to the client); 11.8.6(B)(5) (stating that trial counsel should consider presenting in mitigation: Family, and social history ... professional intervention (by medical personnel, social workers, law enforcement personnel, clergy or others) or lack thereof). Secondly, even counsels brief interviews with several of Respondents family members and the DJJ records should have alerted him to the fact that the family was dysfunctional, Respondent had been raised in a violent home environment, and experienced learning disabilities. All of these factors constituted mitigating evidence and warranted further investigation.

■ Even if trial counsels investigation could be deemed sufficient or adequate, we believe trial counsel also failed to

present any significant mitigating evidence. Trial counsels mitigation presentation consisted solely of Respondents mothers extremely limited testimony.

■ Additionally, we disagree with the States argument that Respondent is not entitled to post-conviction relief given trial counsel made a strategic decision not to present additional evidence in mitigation. "[W]here counsel articulates a valid reason for employing a certain strategy, such conduct will not be deemed ineffective assistance of counsel." *Watson v. State,* 370 S.C. 68, 72, 634 S.E.2d 642, 644 (2006). Counsel's strategy will be reviewed under "an objective standard of reasonableness." *Ingle v. State,* 348 S.C. 467, 470, 560 S.E.2d 401, 402 (2002). For several reasons, counsel's decision was not reasonable and any strategic reason asserted would not excuse the deficient conduct.

First, as outlined above, counsel's investigation was inadequate and incomplete. "This Court has recognized that strategic choices made by counsel after an incomplete investigation are reasonable 'only to the extent that reasonable professional judgment supports the limitations on the investigation.'" *McKnight v. State,* 378 S.C. 33, 45, 661 S.E.2d 354, 360 (2008) (quoting *Von Dohlen v. State,* 360 S.C. 598, 607, 602 S.E.2d 738, 743 (2004)). Secondly, counsel was already aware the jury had rejected the defense theory that Respondent was not the actual perpetrator but was merely present. Therefore, counsel's "all or nothing" approach was unreasonable. Thirdly, it would not have been inconsistent for trial counsel to have pursued this theory in the guilt phase but then offered mitigating evidence in the penalty phase. Clearly, trial counsel could have argued to the jury that even if Respondent was the actual perpetrator he suffered from these mental deficiencies and mental illness at the time of the crime. As the Supreme Court indicated in *Wiggins,* it is not inconsistent to present the accomplice theory during the guilt phase but mitigation evidence in the penalty phase. *Wiggins,* 539 U.S. at 535, 123 S.Ct. 2527 ("While it may well have been strategically defensible upon a reasonably thorough investigation to focus on Wiggins' direct responsibility for the murder, the two sentencing strategies are not necessarily mutually exclusive."). Finally, given the State had already presented damaging character

evidence, we do not believe Respondent's character could have been damaged any further by the presentation of additional mitigating evidence. Trial counsel essentially would have had "nothing to lose" and "everything to gain" by presenting this evidence.

Based on the foregoing, we hold the PCR judge properly found trial counsel's conduct was deficient. There is also evidence to support his finding that Respondent was prejudiced by counsel's deficient performance.

"When a defendant challenges a death sentence, prejudice is established when 'there is a reasonable probability that, absent [counsel's] errors, the sentencer-including an appellate court, to the extent it independently reweighs the evidence-would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Jones v. State,* 332 S.C. 329, 333, 504 S.E.2d 822, 823 (1998) (quoting *Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). This Court explained, "[t]he bottom line is that we must determine whether or not [Respondent] has met his burden of showing that it is reasonably likely that the jury's death sentence would have been different if counsel had presented additional information about [Respondent's] mental condition. In making this determination, we must consider the totality of the evidence before the jury." *Jones,* 332 S.C. at 333, 504 S.E.2d at 824.

In light of Respondent's burden and this Court's standard of review, we agree with the PCR judge that counsel's deficient performance prejudiced Respondent. Admittedly, the State produced overwhelming evidence of Respondent's guilt [6] and the jury found six aggravating factors beyond a reasonable doubt. However, there was very strong mitigating evidence to be weighed against the aggravating circumstances presented by the State. We believe, as did the PCR judge, this evidence may well have influenced the jury's assessment of Respondent's culpability. *See Rompilla v. Beard,* 545 U.S. 374, 393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) ("[A]lthough we suppose it is possible that a jury could have heard [the

---

6. In *Council v. Catoe,* 359 S.C. 120, 128, 597 S.E.2d 782, 786 (2004), this Court noted the State presented an overwhelming amount of evidence of Respondent's guilt.

mitigation case] and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered 'mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Respondent's] culpability' " (quoting *Wiggins*, 539 U.S. at 538, 123 S.Ct. 2527)).

The only evidence presented in mitigation was Respondent's mother's brief testimony. Although the jury heard that Respondent had received mental health treatment between the ages of seven and fourteen, there was no medical evidence or other testimony describing his mental health issues or that several of his immediate family members suffered from mental illness. Furthermore, the jury never heard that: Respondent's father was an extremely violent alcoholic who was divorced by Respondent's mother on the ground of physical cruelty; Respondent and his siblings resided in bad neighborhoods, lived in poverty, and often lived in homes without running water or indoor plumbing; Respondent and his siblings were neglected by their parents and, as a result, on one occasion Respondent suffered severe burns while trying to cook without supervision; Respondent had a significant drop in his I.Q. between the ages of seven and ten which may have been the result of a head injury or the onset of mental illness; Respondent began getting into trouble at the age of ten years most likely as the result of his violent family environment and negative influence of his siblings; Respondent's immediate family members had been diagnosed with mental illnesses such as schizophrenia, schizoid, bipolar disorder, depression, and borderline personality disorder; Respondent had learning disabilities; DJJ caseworkers recognized Respondent's emotional and mental problems; Respondent began using drugs and alcohol at sixteen years old; Respondent attempted suicide in his twenties; Respondent has a borderline I.Q. and frontal lobe brain dysfunction; and the onset of Respondent's current diagnosis of schizophrenia may have begun in early adolescence or childhood.

Although this mitigating evidence may not have risen to the level of "abuse, neglect, and predator and prey situations found in other cases," as the State contends, it nevertheless may have swayed the jury as in *Wiggins*. *See Rompilla*, 545 U.S. at 390–93, 125 S.Ct. 2456 (finding trial counsel's failure to investigate prior conviction file which revealed mitigation evi-

dence concerning defendant's mental health issues, troubled upbringing, and alcoholism fell below the level of reasonable performance and was prejudicial to defendant in death penalty case); *Williams v. Taylor*, 529 U.S. 362, 397–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding defendant in capital murder case was prejudiced where trial counsel failed to investigate and present substantial mitigating evidence during the sentencing phase given "the graphic description of [defendant's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability"); *Von Dohlen*, 360 S.C. at 608, 602 S.E.2d at 743 (holding trial counsel failed to adequately investigate and prepare expert testimony regarding petitioner's mental condition, "adjustment reaction disorder," severe chronic depression, and pathological intoxication, at the time of the murder and petitioner was prejudiced given the outcome of the trial might have been different had the jury heard the available information regarding petitioner's mental condition); *cf. Simpson v. Moore*, 367 S.C. 587, 605–07, 627 S.E.2d 701, 711–12 (2006) (reversing PCR judge's conclusion that capital defendant suffered prejudice from trial counsel's failure to offer sufficient social history evidence in the mitigation case where trial counsel interviewed a number of witnesses about defendant's childhood and life; hired a private investigator to gather background information on defendant; called several witnesses, including three experts, to offer mitigating evidence that defendant grew up in a drug environment, had trouble in school, had been abandoned, had a low I.Q., tested "highly abnormal" on the scales of paranoia, schizophrenia, and mania, suffered from chronic depression, ADD, and post-traumatic stress-disorder, and had a history of drug and alcohol abuse); *Jones*, 332 S.C. at 336–39, 504 S.E.2d at 826–27 (holding capital defendant was not prejudiced by trial counsel's alleged failure to thoroughly investigate and present mitigating evidence regarding his mental impairments where the following evidence was presented in mitigation: six witnesses, who were familiar with defendant's background, testified regarding defendant's learning difficulties and "unusual behavior;" a clinical psychologist who testified that defendant had "some mental deficiency," was "mentally retarded," had some brain damage, and acted

impulsively; concluding that "new" evidence presented at PCR hearing was the same as trial evidence and at best was a "fancier mitigation case").

In sum, we believe there is evidence to support the PCR judge's conclusion that Respondent's trial counsel was ineffective in failing to adequately investigate and present mitigating evidence during the penalty phase of Respondent's trial.[7]

## II.

 The State argues the PCR judge erred in granting a continuance regarding whether Respondent's trial counsel was ineffective in failing to adequately investigate Respondent's mental competence at the time the crimes were committed. We agree.

The PCR judge found neither Dr. Kuglar nor the court-appointed examiners, who examined Respondent only for competence to stand trial, determined Respondent was mentally ill at the time of the crime. The judge noted, however, that Dr. Kuglar had not been provided with the necessary and relevant background information to make this determination. The judge believed that Dr. Kuglar would have found "plenty of red flags pointing up to a need to test further."

---

7. In no way should our decision be construed as minimizing the brutality of the victim's murder. We are, nevertheless, bound by a standard of review which mandates our affirmance of the PCR judge's decision if there is any probative evidence to support it. Moreover, we are cognizant of appellate decisions in this state which determined that counsel's deficient performance in a death penalty case did not warrant reversal where the error did not contribute to the verdict. *See Plath v. Moore*, 130 F.3d 595, 601–02 (4th Cir.1997) (finding trial counsel's alleged failure to present additional mitigating evidence in sentencing phase of capital trial did not warrant habeas relief for petitioner; stating "in weighing the omitted evidence against that actually used to convict and sentence Plath, the mitigating evidence seems insufficient to shift the balance in Plath's favor"); *Arnold v. State/Plath v. State*, 309 S.C. 157, 420 S.E.2d 834 (1992) (finding, in capital case, trial counsel's failure to object to unconstitutional malice charge was harmless where, beyond a reasonable doubt, the error did not contribute to the verdict in light of the overwhelming evidence of malice). We cannot say that the undiscovered mitigating evidence, taken as a whole, would not have influenced at least one juror to recommend a life sentence for Respondent. Thus, we are unable to find trial counsel's deficient performance was not prejudicial.

The PCR judge opined "[a]ll of this information raises questions about whether [Respondent] was mentally ill prior to these offenses and what if any impact his mental illness had on his thinking and behavior at the time of these offenses." The judge believed these questions were not adequately addressed prior to trial because the court-appointed examinations were conducted solely on the issue of competence to stand trial. Furthermore, the judge found that Dr. Schwartz–Watts was unable to adequately examine Respondent with respect to his mental state at the time of the crimes due to his current state of incompetence.

In light of these findings, the PCR judge ruled the issue of whether Respondent's trial counsel was ineffective for failing to adequately investigate Respondent's mental state at the time of the crime was a "fact-based challenge to his defense counsel's conduct at trial that cannot be adequately addressed until [Respondent] regains competence." As a result, the judge granted a continuance staying review of this allegation until Respondent regains competence.[8]

We agree with the State's assertion that the PCR judge's legal conclusions are "flawed." We find the PCR judge analyzed this issue without properly applying the rule adopted by this Court in *Council v. Catoe*, 359 S.C. 120, 597 S.E.2d 782 (2004).

Initially, there appears to be no dispute that Respondent was, and is currently, incompetent. Thus, pursuant to the mandate in *Council v. Catoe*,[9] the PCR judge should have

8. The PCR judge inferred that it would be unlikely that Respondent would regain competence. Based on our review of the record and the opinion of Dr. Schwartz–Watts, we agree with the PCR judge's assessment. Thus, even if Respondent is sentenced to death after a resentencing hearing, we believe it is doubtful that he will ever be executed in light of our decision in *Singleton*.

9. In *Council v. Catoe*, this Court stated:

the default rule is that PCR hearings must proceed even though a petitioner is incompetent. For issues requiring the petitioner's competence to assist his PCR counsel, such as a fact-based challenge to his defense counsel's conduct at trial, the PCR judge may grant a continuance, staying the review of those issues until petitioner regains his competence. All other PCR claims will not be subject to a continuance based on a petitioner's incompetence.

ruled on the allegation for relief unless Respondent's PCR counsel could establish that this issue constituted a "fact-based challenge" to Respondent's counsel's conduct at trial. If Respondent's incompetency inhibited the PCR challenge, then a continuance would have been proper. We believe Respondent's assistance was not required and, thus, the PCR allegation was properly before the judge.

In our view, the collateral attack on trial counsel's conduct regarding Respondent's mental state and criminal responsibility at the time of the crime was dependent on Respondent's records as well as the testimony of experts and others who observed Respondent around the time of the crime. Therefore, we do not believe Respondent's assistance or decision making was required. Moreover, all of the evidence needed to rule on this issue was presented at the PCR hearing. Specifically, the PCR judge had before him the trial transcript, the testimony of defense counsel, Dr. Kuglar, Dr. Brawley, and Dr. Schwartz–Watts, as well as Respondent's records. Accordingly, we find the PCR judge erred in granting a continuance.

In light of our holding, the question becomes whether this Court should rule on the merits of the ineffectiveness of counsel issue. Because this Court reviews PCR decisions pursuant to an "any evidence" standard, we find it is procedurally proper to remand this issue for the PCR judge to make a definitive ruling. On remand, the PCR court shall consider the evidentiary record established at the prior PCR hearing in addition to any relevant evidence admitted on remand.

## CONCLUSION

Given there is evidence to support the PCR judge's holding that Respondent's trial counsel was ineffective in failing to investigate and present mitigating evidence at the penalty phase of Respondent's trial, we affirm the PCR judge's decision vacating Respondent's sentence and ordering a new sentencing hearing. We, however, find the PCR judge erred in continuing indefinitely one of the PCR grounds until Respon-

*Council v. Catoe,* 359 S.C. at 130, 597 S.E.2d at 787.

dent regains competence. Because Respondent's assistance is not required for PCR counsel to present the issue regarding whether Respondent's trial counsel was ineffective in failing to adequately investigate Respondent's mental competence at the time the crimes were committed, we reverse the PCR judge's order on this issue and remand for the PCR judge to rule based on the evidentiary record presented at the PCR hearing in addition to any relevant evidence admitted at the hearing on remand.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

MOORE, WALLER and PLEICONES, JJ., concur.

TOAL, C.J., concurring in part and dissenting in part in a separate opinion.

Chief Justice TOAL:

Although I agree that the PCR court erred in granting a continuance as to trial counsel's investigation of Respondent's mental competence at the time the crime was committed, I disagree with the majority regarding trial counsel's performance during the mitigation phase of trial. In my view, even assuming trial counsel was deficient in presenting mitigating evidence, Respondent was not prejudiced. Considering the overwhelming evidence against Respondent, the violent and brutal nature of this crime, and the fact that the jury found the existence of six aggravating factors beyond a reasonable doubt, in my opinion, it is not reasonably likely that the jury would have returned a different sentence. *See Jones v. State,* 332 S.C. 329, 333, 504 S.E.2d 822, 824 (1998) (recognizing that the PCR applicant bears the burden of showing that it is reasonably likely that the jury's death sentence would have been different if counsel had presented additional mitigation evidence); *see also Plath v. Moore,* 130 F.3d 595, 602 (4th Cir.1997) (holding that, considering the sheer magnitude of the aggravating evidence, the defendant failed to show prejudice from trial counsels failure to present certain mitigating evidence). Accordingly, I would reverse the PCR court's order finding trial counsel ineffective during the mitigation phase of Respondent's trial.