761 S.E.2d 757

John Edward WEIK, Petitioner,

v.

STATE of South Carolina, Respondent.

Appellate Case No. 2007–060700.

No. 27421.

Supreme Court of South Carolina.

Heard Feb. 19, 2014.

Decided July 23, 2014.

Chief Appellate Defender Robert Michael Dudek, of Columbia, for Petitioner.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, and Senior Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia, for the Respondent.

Justice KITTREDGE.

We granted a writ of certiorari to review the denial of John Edward Weik's (Weik or Petitioner) application for capital post-conviction relief (PCR). Weik argues the PCR court erred in denying relief on a number of grounds. We reach only the challenge concerning the complete lack of social history mitigation evidence in the sentencing phase. Because of the lack of social history mitigation evidence, we are constrained to reverse and remand for a new sentencing hearing.

## I.

Weik was convicted of murdering his former girlfriend following an argument over the couple's child. Weik confessed to the shooting and cooperated with law enforcement. There was never any dispute regarding guilt.

During the sentencing phase, the State proceeded on two aggravating circumstances—burglary and torture.[1] Regarding Weik's mental status, the defense relied on three mental health experts, who all of whom testified that Weik suffers from paranoid schizophrenia, including auditory and visual hallucinations, suicidal ideations, and paranoid delusions.[2]

---

[1]. Burglary was asserted because the shooting occurred on the victim's property, and torture was predicated on the multiple shots the victim sustained.

[2]. In his statement to police, Weik stated that he heard voices in his head just before the shooting, felt as if some physical force kept him

The defense, however, failed to present readily available evidence concerning Weik's chaotic upbringing and dysfunctional family. It is the absence of the social history mitigation evidence that compels us, under controlling United States Supreme Court precedents, to grant Weik a new sentencing hearing.

### A.

Pre-trial interviews conducted with Weik's relatives, co-workers, and other acquaintances revealed Weik's childhood was traumatic, filled with emotional and physical abuse at the hands of his psychotic father, Russell Weik. Indeed, one mitigation specialist with forty years of investigative experience described Weik's family as the most dysfunctional family she had ever encountered.

Despite the wealth of social mitigating information defense investigators discovered about Weik's troubled background, during the penalty phase of the trial, defense counsel called only one witness, Weik's youngest sister, Amy, to testify very briefly about Petitioner's abusive upbringing. This part of Amy's testimony comprises three pages out of a multi-thousand page record. This limited and general testimony offered nothing in terms of specifics, as Weik's childhood was described as merely "rough." When Amy was asked to be "more specific" about Weik, she replied, "the abuse that we suffered, all of us." Cursory and nonspecific reference was made to Weik's father's "military flashbacks." Amy concluded her scant testimony as to Weik's upbringing and childhood by stating that our "father was always paranoid, abusive, I don't know. Something was wrong with him and I don't know exactly what it was."

---

from leaving the victim's home, and as he shot the victim, he watched it "from above and the side" as if his actions were being played "on a monitor." Specifically, Weik believes he is being targeted by federal investigative agencies and that employees of the CIA and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) drive by his home multiple times each day in vehicles equipped with computers that monitor his whereabouts and track his activity. Weik is also suspicious of the Masons and was adamant that he assist counsel in selecting the jury to ensure there were no CIA agents or Masons selected to serve on his jury. Weik also quietly chanted passages from the Bible throughout his trial, "so the voices [in his head] would not bother [him]."

No other family members or coworkers were called to testify on Weik's behalf during the sentencing phase.[3]

The State countered with expert testimony from two mental health experts who both testified Weik did not have schizophrenia, but rather, he suffered from schizotypal personality disorder. The State's forensic psychologist also testified that Weik: (1) was the product of an "intact" family; (2) developed normally; (3) did not experience any childhood behavioral problems; (4) quit high school in eleventh grade; (5) had an average IQ; and (6) did not suffer from any alcohol or drug abuse issues.

At the conclusion of the sentencing hearing, the jury recommended a sentence of death, which the trial court imposed. Weik's conviction and sentence were affirmed on direct appeal. *State v. Weik*, 356 S.C. 76, 587 S.E.2d 683 (2002).

### B.

Thereafter, Weik filed a PCR application claiming, among other things, that trial counsel were ineffective for failing to present mitigation evidence relating to his family and social history that was available at the time of his trial. The testimony elicited during the PCR hearing revealed trial counsel's troubling inattention towards preparing for the mitigation phase of trial, despite Petitioner's admission of guilt from the outset of the case.

After the State served notice of intent to seek the death penalty, attorneys Percy Beauford[4] and Marva Ann Hardee–Thomas[5] were appointed to represent Weik in July of 1998.

---

3. During the *guilt* phase, defense counsel called Petitioner's mother. However, her testimony regarding Weik's upbringing occurred during an in camera hearing and was never heard by the jury. Several other members of Weik's family were present at trial and willing to testify but were never called by defense counsel.

4. While Beauford was an experienced criminal lawyer, he had never previously represented a client facing the death penalty or attended any seminars or continuing legal education courses dedicated to capital defense. However, Beauford testified that he did consult briefly with two experienced, local attorneys prior to trial.

5. Hardee–Thomas is currently suspended from the practice of law. *See In re Marva Ann Hardee–Thomas*, 391 S.C. 451, 706 S.E.2d 507 (2011)

However, it was not until March 1999—a mere eleven weeks prior to trial—that counsel hired investigator Patti Rickborn [6] to begin a mitigation investigation. Rickborn testified that she met with Beauford and Hardee–Thomas only once, and during that one meeting, it was "absolutely clear" that Hardee–Thomas was to be her contact person. According to Rickborn, she made repeated requests for Hardee–Thomas to provide her investigative leads, names and contact information for the defense mental health experts, and assistance in obtaining a court order for Weik's father's military mental health records; however, despite Rickborn's persistence, Hardee–Thomas gave only evasive replies, promising to respond in the future, or failed to acknowledge Rickborn's requests altogether.

Despite receiving virtually no guidance from defense counsel, Rickborn, an experienced mitigation specialist, began the investigation and was able to provide Hardee–Thomas with a potential witness list for the penalty phase, which included contact information for Weik's parents, siblings, and other family members, a list of places from which to obtain records, as well as detailed investigative interviews with Weik's family members that revealed pervasive mental health issues throughout the Weik family and that Weik endured severe emotional, psychological, and physical abuse during his childhood. Rickborn provided all of this information to Hardee–Thomas but received no response.[7]

---

(citing Rules 1.1 (Competence), 1.3 (Diligence), 1.15 (Safekeeping Property), 8.4(a) (Misconduct), 8.4(d) (Conduct involving dishonesty), and 8.4(e) (Conduct prejudicial to the administration of justice)). Hardee–Thomas's disciplinary history also includes a Letter of Caution without a finding of misconduct and an Admonition citing Rules 1.1 (Competence), 1.3 (Diligence), and 1.4 (Communication). At the time of Petitioner's trial, Hardee–Thomas, a contract public defender, had approximately four years of felony trial experience and claimed to have been "third chair" in one previous death penalty case.

6. Rickborn has been a mitigation specialist since 1985, and at the time of Weik's trial, she had worked on approximately twenty capital cases.

7. At the PCR hearing, Petitioner produced a number of letters from Rickborn to counsel indicating she needed additional information from counsel. In her letters to Hardee–Thomas, Rickborn also suggested counsel take certain follow-up steps and emphasized the importance of family witnesses to provide information about Weik's childhood and

Approximately six or seven weeks after being hired, an exasperated Rickborn resigned from the defense team. In her resignation letter,[8] Rickborn explained she was no longer

social history due to the lack of corroborating medical and school records. Rickborn testified that she provided such direction because Hardee–Thomas "didn't seem to know what to do with the information I was giving her." Likewise, Jeff Bloom, who was retained by counsel as a jury consultant one week prior to trial, testified at the PCR hearing that it was clear from his interaction with counsel that they were "in way over their heads" and did not understand the mitigation evidence they had or how to use it.

8. In her final letter, Rickborn stated:
 I have been working on this case six to seven weeks. During this time I have asked that certain steps be taken by you as attorneys to assist me with preparing the best defense possible for [Weik] should his case reach the penalty phase.
 I have asked that you try to obtain a court order for the client's medical records. Since it was so late in the case when I became involved I felt this would expedite [the] collection of medical records. It would also have allowed me to cover a wide area of medical facilities to try to be sure that we had all records of the client's treatment for the head injuries that he reported. Since I did not receive that I obtained Dorchester County subpoenas and spent a great deal of time trying to obtain any records that may exist for the client.
 I have asked that you try to obtain a court order for medical and psychiatric records for Russell Weik, the client's father. Since these records would be maintained by the Veteran's Hospital, part of the United States Military, I knew that we could not get a copy of these records without a court order. These records could have been important to establish the condition of Russell Weik and substantiate the client's siblings['] stories. Even if we presented a court order to obtain those records today we would probably not get these records until the trial is underway.
 . . . .
 I have documented the memos that I have mailed and faxed to Ms. Hardee–Thomas. I have never gotten a satisfactory response. I was sending these things to Ms. Hardee–Thomas because Mr. Beauford told me, in her presence, that she would be handling the "paper-work" on this case. When I have been able to speak with Ms. Hardee–Thomas on the phone she is always in a rush and hangs up before I can discuss the case with her.
 I have found reports of emotional, psychological and physical abuse in the client's family. I have prepared reports and forwarded them to the doctors. I have supplied you with a potential witness list. Most of them have been contacted.
 . . . .
 At this time I do not know if I need to resign from this case because I do not know if an order was ever approved by the judge for me to

willing to assist counsel with Petitioner's case because counsel failed to provide her with investigative leads, repeatedly failed to answer her direct questions or otherwise cooperate with her, and failed to provide her a copy of an order approving payment for her services.[9] In her PCR testimony, Rickborn stated she was "completely frustrated" because "I was getting no response from them. I mean, as far as I was concerned, I wasn't working with anybody. There was nobody to work with."

About a week later, counsel contacted a different mitigation investigator, Scott Parker, to complete the investigation Rickborn had begun. Due to the incomplete status of the investigation, Parker requested two months' additional time to prepare, and as a result the defense team moved for a continuance.

During the pre-trial hearing on the continuance motion, Beauford explained that Rickborn left the defense team and requested that the trial be continued for a period of two weeks to allow a substitute investigator time to obtain certain medical records.[10] Beauford was not candid with the trial judge about the true reason for Rickborn's departure, opting to invoke "communication problems" as the reason for her departure. When the trial judge directly asked counsel to explain why Rickborn quit, counsel stated, "I would think communication problems is a broad area we could use on the record."

The trial judge then stated:

If she's got a good reason to leave, I need to know it really on the record. In other words, if it's prejudicial to your client that she has jumped ship on you at the last second, you had to get somebody else, then I need to know what it is and I need to know what specifically your new fellow is

work on this case. In fact, I took myself off another case to work on this case. I will not be able to assist you further with this case.

9. PCR evidence revealed defense counsel never requested an order approving payment for Rickborn's services, and Rickborn was never paid for the work she performed on Weik's case.

10. Specifically, Beauford cited the need to obtain Petitioner's father's military psychiatric records—some of the very documents Rickborn requested that Hardee–Thomas assist her in procuring months earlier.

going to do, how much time he needs, what it is he needs to do so I can say, all right, this is how it's going to be or isn't.

Despite this lifeline from the judge, counsel did not budge and reiterated, "basically, it was a matter of I guess communication in a sense. And I don't know what happened there. I mean basically she felt the communication wasn't the way she wanted it to be, so she decided not to be a part of the team, in short." Counsel failed to disclose Rickborn's resignation letter, or otherwise reveal the true reasons for Rickborn's departure. Not knowing counsel's complete lack of preparation regarding Weik's social history, the trial judge denied the motion for a continuance but offered to issue an order or make telephone calls to expedite the process of obtaining the records.

Thereafter, Parker conducted interviews with Weik's mother and father, brother Chris, sister Maggie, and brother-in-law Bill in an effort to uncover mitigating evidence for use at trial. Parker testified that he provided all of his interview reports to Beauford within two days of conducting each interview, but counsel never asked to meet with him to discuss or review any of the reports or instructed Parker to take any follow-up steps.[11] Parker testified that he was willing to offer counsel suggestions on how to integrate the information he discovered into the mitigation phase of trial, but counsel never asked him about any of the interviews he conducted or information he discovered, either before or during trial.

In short, some mitigating evidence of Weik's social history was developed and available to trial counsel for the sentencing phase. There is no evidence in the record to suggest trial counsel made any effort to obtain and review this mitigation evidence. What is clear is that the jury heard from only

---

11. The record does not reflect that Parker was provided with any of the information Rickborn gathered in order to aid his investigation, despite the fact that Rickborn had previously interviewed almost all of the witnesses with whom Parker spoke. Likewise, it does not appear that Parker was provided any information gathered by Bobby Minter, a fact investigator retained to assist counsel with the guilt phase of the trial, who had interviewed several of Petitioner's former coworkers, acquaintances, and relatives and provided counsel with a detailed list of those potential witnesses before Parker was retained.

Petitioner's sister Amy, whose testimony revealed virtually nothing about Weik's abusive upbringing.[12]

## II.

### A.

At the PCR hearing, Weik presented the extensive mitigating evidence that was discovered before trial by defense investigators and available to counsel at the time of trial. Unlike the evidence presented during Weik's trial, which left the jury knowing no details about his social history, this extensive evidence shed light on his extremely dysfunctional, unstable, and abusive childhood.

Weik lived his entire life with his parents in a house that was filthy, had fallen into disrepair,[13] and did not have running water for a period of several years. Weik's father Russell Weik (Russell) compulsively hoarded things (particularly mili-

12. Further, Amy testified at PCR that she met with trial counsel only one time about two weeks before Petitioner's trial regarding her testimony at trial; however, Amy stated counsel never asked her about her knowledge of Weik's childhood background or social history and that she and counsel never discussed the questions she would be asked prior to her taking the stand. Amy stated that, on the morning she was to testify, she told Beauford she felt like she had had a "nervous breakdown" due to some harassing phone calls she allegedly received from the Solicitor the night before, but Beauford did not respond or inquire about her emotional state/ability to testify effectively on the day of the trial.

During the PCR hearing, Beauford was questioned:

Q: Since you didn't have an opportunity to know what [Amy] had said in the report or the interview that she gave to Ms. Rickborn, you didn't know what questions to ask to get that information out to the jury, did you?

A: I didn't know specifically, but I think I asked the open-ended questions that could have allowed it—maybe not—she didn't follow up and I didn't follow up, not knowing what the information was that I needed to get out to the jury.

Q. That's my point. I mean, if you had available to you, a report Ms. Rickborn had of her interview with Amy Weik, there was a lot more information [Amy] knew about. Isn't that correct?

A. I don't know what the report says, but possibly, it could have, yes.

13. Parker initially could not locate the family home due to the dense overgrowth of vines and shrubbery which "completely engulf the structure and obscure it from view," even though it sits just a few feet from the road.

tary-related items such as guns, knives, swords, and other weapons and munitions) such that the inside and outside of the home were piled high with junk and debris, leaving only narrow passages for getting around. By all accounts, Russell would "go crazy and start breaking up things" if anyone attempted to straighten any of the clutter.

Chris Weik, Petitioner's younger brother, stated he and his siblings lived in one bedroom. He described his family as "very poor." Chris described his home as very old and lacking air conditioning and running water for a period of time. Chris testified other children frequently teased him and his siblings about being so poor and that he and Petitioner would get "beat up, hit with rocks, [and] throwed in the dirt" by other children. Chris testified Petitioner's learning disability was apparent from a very early age and that Petitioner attended special education classes. Chris explained that Petitioner was born with a very large head, and that his family made fun of him for it, even nicknaming him "Eggy" due to his "egg head." Chris testified Petitioner did not drop out of school, but was expelled after he fought another student who teased him for being "slow."

Chris also testified about growing up in a household with their father, Russell. Chris stated his father experienced daily Vietnam flashbacks, and he would get out his gun, load it, sharpen his bayonet, and put on his Army helmet and pack. Chris claimed his father told them he executed over two thousand people in Vietnam, and he taught them how to kill people by "crushing the windpipe" and "snatching the heart." Chris indicated that when their father took them camping, he would give them a forty-five caliber semiautomatic pistol and tell them to stand guard against the Viet Cong. Chris stated his father brought home bags of concrete, weapons, C-rations, helmets, canteens, and bayonets to prepare for any future attacks and set tripwires in the yard to teach his children that life is unpredictable. Chris stated his father had a forty-four Magnum, a German Mauser, cap and ball pistols, hand grenades, dynamite, and blasting caps, all of which were handled loosely around the children. Chris claimed he and Petitioner had their own survival packs, which included bayonets and gun cleaning kits. Chris indicated Petitioner, like Russell, was fascinated with guns.

Chris testified Russell would not allow them to invite friends over because he feared they might be spies. Chris and Petitioner were also not allowed to discuss anything that happened in the house with others. Chris stated he and Petitioner had been beaten with rubber hoses, rose bush switches, a car antenna, a coax cable, and a machete. Chris testified his father beat him two to three times a month, and sometimes kicked him in the backside with steel-toed boots. Chris claimed his father would also punish his children by locking them in the sweltering hot attic, which had no air conditioning and windows that were nailed shut, for hours at a time.

Ramonda "Rae" Ferrer–Klocek, Petitioner's half-sister, stated that after her father died when she was nine years old and her mother married Russell, her home life became miserable. Rae described Russell as a harsh disciplinarian who consistently berated all of the children, particularly Petitioner, who was an easy target because he was "slow." According to Rae, Russell called Petitioner "worthless" and "stupid" and told him he would never be good for anything. Rae stated that Russell's aggression towards Petitioner became worse when Petitioner started school and struggled with his schoolwork. Rae remembered seeing Petitioner hit himself in the head with his fists and call himself stupid, like his father did.

Rae recalled a time when Petitioner was still in diapers that Russell became angry at him and struck him so hard that Petitioner came off the ground and slammed into the wall. Rae also recounted a time when Russell flew into a rage over a minor annoyance and shot the children's long-time pet. According to Rae, she and the other children "always had to walk on eggshells and be careful not to make too much noise because annoyances would set him off and trigger a fit of rage." Rae stated that her mother did not defend the children from Russell's abuse. Rae responded to the abusive environment by moving to New Hampshire.

Magdalena "Maggie" Ferrer Gunter, Petitioner's half-sister, testified that living with Russell was "hell" because he had a very violent, sometimes outrageous temper, and he would break items in her mother's house. According to Maggie, Russell kept an abnormally large quantity of firearms in the

home and enjoyed "being like on a power trip, like he could control you." Maggie recalled one time when her mother had left home for a few hours, for no discernable reason, Russell made her sit at the kitchen table, forbidding her to move until her mother returned home. Maggie stated that, had she not married Bill Gunter at age eighteen and moved to Florida, she would have "gotten away somehow" because "nobody would want to stay there very long."

Maggie also testified about Petitioner's odd behaviors as a child, including that he "would laugh at things that weren't really funny to us or to the average person." Maggie also stated that Petitioner was slow learning to talk, but once he began, he was a very talkative child, speaking very quickly and rambling from thought to thought. Maggie stated that she suspected Petitioner may have had some mental health issues, but Petitioner never had a psychological evaluation because her family did not believe in taking children to doctors and could not afford medical or psychiatric care.

Bill Gunter, who served in the military with Russell and married Russell's step-daughter Maggie in 1969, testified that Russell obsessively collected guns and other weapons, including live dynamite, in the home, "for his protection" because Russell "feared the government quite a bit, he was afraid we were going to be invaded and we're going to need the guns to defend ourselves … against [ ]our enemies." According to Bill, Russell did not act as a father figure towards the children, who he largely ignored, except to torment Petitioner and Chris in order to "toughen them up." In that regard, Bill stated Russell would require the boys to perform tasks like standing at attention outside at all hours of the night in their underwear, submitting to personal inspections in the bathtub, marching around the yard, and responding to military-style commands.

Russell had an unpredictable and violent temper. Bill stated there was no way to anticipate what was going to upset Russell, and he would get very angry and beat the kids with "whatever he could get his hands on." Bill recounted that he had seen Russell use his fists to hit his sons in the chest and in the face and whip them with a flyswatter, an antenna, and his belt. Bill also confirmed that Russell claimed to have taught

his children various methods to kill another person, including "a quick way of killing [someone] where they wouldn't make any sounds." Bill also testified that Russell spoke often of his participation in clandestine CIA operations both in Vietnam and stateside after the war ended. Bill understood that Russell was extremely unstable.

As to Petitioner's childhood, Bill testified that as a young child, Petitioner looked different than most children because of his enlarged head. Bill also stated that Petitioner "seemed to develop slower than the other children did at his age. He walked at a much later date, he began to talk very slowly, he didn't seem to grasp things as quickly as other children did." Bill also stated that it took Petitioner much longer than other children to be potty trained. Bill also testified that, as a young child, Petitioner appeared to do things in search of attention and praise and "he got very little of either. When he would do something good his father seemed to just take an indifferent approach to it." Bill also stated that Petitioner did not relate well to other children and "other kids seemed to tease him a lot because they could fluster him." Bill testified that, as a teenager, Petitioner had very few friends and became somewhat of a loner. Bill also stated that as Petitioner aged, he began to have difficulty concentrating, experienced dramatic personality swings and became unpredictably irritable.

By all accounts, Russell regularly suffers from "flashbacks" regarding his service in the military. In one of these events, Russell mistook his daughter Amy for "Charlie" and violently strangled the girl, who was just eight years old at the time. Amy's life was saved only by Petitioner's mother intervening and hitting Russell in the head with a frying pan, knocking him unconscious. Russell acknowledges that he was not a good father and was very abusive and violent towards his children, but maintains that he "could not help it." Russell also proudly claims that he "trained" his children in "hand-to-hand combat" and "jujitsu" and taught them "how to protect themselves."

Undeniably, Russell was the biggest influence in shaping Petitioner's childhood. It is the evidence regarding Russell's impact in particular that Petitioner claims would have affected

the jury's sentencing decision. The impact of this omitted evidence can only be appreciated through a recitation of the most pertinent parts of Russell's PCR testimony.

Russell is obsessed with the military and conjures detailed fantasies about being involved in various military missions. At the PCR hearing, Russell testified that after boot camp, he was approached to be a "ghost warrior" and participate in a "little experimentation"—a joint effort among the CIA, the Marines, and the Navy.[14] Russell stated that he received military training in "[f]ire fighting, nuclear biological chemical warfare defense, and also damage control." Russell, who never served in Vietnam, testified about a time when he was purportedly serving as a colonel in the Marines and led a group of eight Navy SEALs armed with AR–15 rifles on a nighttime parachute mission outside Saigon. Russell explained:

Q: What was the purpose of the compound [you set up in Vietnam]?

A: Well, it started off in December of '64 when I got over there as an observation investigation team. We were to go out and we were the observers and we were also the people who made sure what was happening was according to the Geneva [C]onvention.... [T]he CIA told me to act like Gomer Pyle because everybody over there watched his show and Andy of Mayberry. So I would holler golly, shazam, or something like that because I was Jim Nabors.

Q: You got instructions from the [CIA] to do that?

A: Yeah. I had two people with me. One was an African American. The other was Caucasian, and their names were Smith and Jones, and the next week Jones was Smith and Smith was Jones.

. . . .

Q. Now, who paid you? Did the CIA pay you?

14. Russell claims he was employed by the CIA while simultaneously serving in both the Marine Corps and the Navy. Russell stated that, while serving in the military, he was granted a Top Secret level security clearance, which he maintains to this day. To be sure, Russell is a psychotic, very disturbed individual.

A. It was all in scrip.... They didn't want you to use American money, and that's what it was in.... The next question you're going to ask is whether I was being paid as an E–3 or as a Colonel.

Q. I wasn't actually, but that is a good question. Why don't you go ahead and answer it.

A. I was paid as an E–3 because one of the things they didn't want was people to find out I was getting more money than them or something like that, and ... I had the authority. In other words, by the power invested in me by the President of the United States and the Director of the CIA, I had the power to take over any phase or any plane or anything.... [I] [w]alked up to the Bird Colonel and told him he was my subordinate and the CIA man said, yes, sir, you are his subordinate. He is your commanding officer, and I said by the power invested in me by the President of the United States and Director of the CIA I now accept responsibility for your base, and all that it contains.

Regarding one instance of combat during the six months he claimed to have spent in Vietnam, Russell stated:

A: When you're going to die you get desperate, and I got all the people together and I told them that I wanted to live through this, and I said at the end of the day I hope we (*portion not audible due to the witness getting very emotional*). It was quite an interesting day.... I went around and counted the dead and it was three thousand sixty people.

Q: Were these Vietnamese?

A: Well, there wasn't much difference at that time because you didn't know whether it was North Vietnamese or Regulars. They all dressed the same. Little black pajamas and little hats.

Russell explained that, after returning from Vietnam, he was discharged from the military but reenlisted a short time later and was stationed in Charleston. Russell explained that, after reenlisting, he woke up one morning with dizziness, shortness of breath and a headache, so he "went up there to the sick call place, and they said I was having a nervous breakdown or something another." Regarding his treatment

at the Charleston Naval Hospital, Russell explained, "I was back behind echo ward in what they called the observation unit first, and the CIA said they had to write me a new history because I stuck out like a turd in a punch bowl."

Thereafter, PCR counsel confronted Russell with his military records, which do not reflect any service in Vietnam.[15] Russell explained that those military records were inaccurate and fabricated by the CIA when they "rewrote his history" and that he was instructed by CIA personnel not to discuss the matter. According to Russell, even after his military service ended, he continued to serve as an undercover operative for the CIA.

## B.

At the PCR hearing, the State elicited testimony from Petitioner's trial counsel. According to Beauford, his primary role was focused on the initial phase of the trial, and Hardee–Thomas's primary role was to hire, coordinate, and assist the mental health experts and mitigation investigators in preparation for the penalty phase. Beauford stated that he relied on Hardee–Thomas to coordinate these mitigation efforts and that he was unaware Hardee–Thomas utterly failed to do those things until just before trial. When asked about the nature of Hardee–Thomas's role, Beauford stated, "I wouldn't know what her role would be if you don't take any active part within the trial." Beauford stated that, during trial, Hardee–Thomas was present, occupying space, but did not contribute anything useful or of substance during the entire case, and he felt absolutely alone in representing Petitioner.

Beauford testified he knew at the time of trial that Petitioner's father was "very abusive." Beauford testified he met several of Petitioner's family members and was aware of Russell's belief that he worked for the CIA. Despite meeting Russell prior to trial, Beauford stated he did not realize

15. Russell never served in Vietnam. According to official records, Russell actively served in the Navy for four years and eight months and was honorably discharged after being hospitalized for chronic schizophrenia in July 1965. These records also reveal that Russell saw no combat and his most noteworthy accomplishment during service was completing his GED in December 1961.

Russell was lying about his service with the CIA in Vietnam because he "didn't know him like that." Beauford conceded Russell was somewhat eccentric, but he stated, "you never know what a person might have been involved in at any time in these covert operations. So I just left it alone." At the PCR hearing, Beauford was questioned:

Q: So no alarms went off in your head that [Russell] might be—there may be some further problem working behind the lines?

A: Well, I mean, his behavior suggested something was wrong, but, again, I could read that into being in Vietnam or exposed to some chemical or something. I did think in the conversation when he was going on maybe about Agent Orange or something like that, but I didn't take the conversation to that extent.

Not having reviewed any of the interviews from Rickborn and Parker, Beauford chose to call Amy because she was "more stable" and could convey things better than others. However, Beauford admitted he did not know about Rickborn's reports and did not review those from Parker prior to trial; thus, he did not rely on that information in determining whether to call Petitioner's mother, father, and siblings as mitigation witnesses. Beauford conceded the interviews he failed to review prior to trial constituted "significant mitigation evidence" and that it would have been important for the jury to see that Petitioner was raised in a family surrounded by mentally ill people.[16]

Hardee–Thomas admitted she never attempted to strategize, to discuss the defense theory of either phase of the trial, or to discuss the usefulness of the information from investigators and experts with Beauford. Hardee–Thomas testified

---

16. Both Russell and Russell's father (Petitioner's paternal grandfather) suffered "nervous breakdowns" and were hospitalized for psychiatric illness. Additionally, Petitioner's mother and all of his siblings suffered from some form of mental health issue, such as depression, or alcohol or drug abuse problems. At the PCR hearing, two mental health experts testified that, had they been provided with this information prior to trial, they would have been able to emphasize Petitioner's strong genetic predisposition to schizophrenia and impeach the State's mental health experts, who diagnosed Petitioner with schizotypal personality disorder, which is considered a less severe disorder.

her role in Weik's case was "assisting Mr. Beauford" as the "paper person" and "silent party." Hardee–Thomas stated she was not involved in deciding which witnesses to call, developing a theory of the case, or developing a mitigation strategy. Hardee–Thomas contended that she assumed such a role because Beauford wanted it that way. She stated she did not consider assuming a leadership role in the case because Beauford had already begun working on the case at the time she was appointed.[17] Hardee–Thomas claimed she wondered why she was appointed at all given that her involvement was so limited, but she never considered raising the issue to Beauford or the trial judge because she did not think that was appropriate. When asked for an explanation, Hardee–Thomas replied, "It's my understanding that I provided Mr. Beauford with the information and he decided the trial strategy."

When asked why obtaining evidence for the penalty phase of a capital case is important, Hardee–Thomas answered, "To give some defenses if anything." When asked how the information obtained by the mitigation investigators could have been used at trial, Hardee–Thomas responded, "To help Mr. Beauford help defend [Petitioner]."

Following a lengthy hearing, the PCR judge issued an order of dismissal, denying relief and finding counsel presented all available testimony to the jury and that counsel's decision to call only Amy could not be deemed deficient. As to prejudice, the PCR judge acknowledged there may have been other family members who were willing to testify, including Chris and Bill, and agreed those witnesses may have been able to provide additional perspectives regarding Petitioner's social history. However, the PCR judge found that "there has been an inadequate showing that there were relevant omissions such that to a reasonable probability the result would have been different." Thus, the PCR judge determined the additional witnesses and evidence would have merely provided

17. Beauford was initially retained by Petitioner's parents to represent Petitioner. However, after the State served its notice of intent to seek the death penalty, Petitioner's parents informed Beauford they could not afford the cost of hiring mental health experts or a mitigation investigation. Thereafter, Beauford and Hardee–Thomas were appointed to represent Petitioner.

Petitioner with a "fancier" mitigation case, which is insufficient to show prejudice.[18] This Court granted certiorari to review the order of the PCR court.

## III.

■ Weik argues counsel were ineffective for failing to present substantial mitigating evidence that was available at the time of his trial. Specifically, Weik argues defense investigators conducted extensive interviews with his family members and others, who provided significant mitigating information regarding the severe abuse he endured as a child, and that counsel were ineffective for failing to present that available information to the jury. Under current law, we must agree and find counsel were deficient in failing to present this readily available mitigating evidence. We further find Weik has established prejudice, for counsel's constitutionally deficient representation undermines confidence in the outcome.

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted). "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). "[T]o establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 534, 123 S.Ct. 2527 (quotations and citation omitted). "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.* Prejudice is established where "there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537, 123 S.Ct. 2527 (citation omitted). A "reasonable probability" is less than a preponderance of the evidence but still "a

---

18. *See Jones v. State*, 332 S.C. 329, 339, 504 S.E.2d 822, 827 (1998) (finding that the absence of "fancier" mitigation evidence does not render the prior mitigation case constitutionally inadequate where such evidence would not have had any effect on the outcome of the trial).

probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 693–94, 104 S.Ct. 2052.

 "The sentencing stage is the most critical phase of a death penalty case." *Romano v. Gibson,* 239 F.3d 1156, 1180 (10th Cir.2001). "Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Id.* During the sentencing phase of a death penalty trial, counsel is required to investigate and present meaningful mitigating evidence absent a reasonable strategic choice not to do so. *Rompilla v. Beard,* 545 U.S. 374, 390–93, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (citing *Wiggins,* 539 U.S. at 538, 123 S.Ct. 2527). Important sentencing phase considerations include a defendant's "medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527 (finding testimony that defendant suffered "physical torment" and sexual abuse as a result of his alcoholic, absentee mother and subsequent foster families constituted a "powerful mitigating narrative" that counsel was ineffective for failing to present); *see Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ("Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable than defendants who have no such excuse."); *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (noting that consideration of the offender's life history is a "part of the process of inflicting the penalty of death"); *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (invalidating an Ohio law that did not permit consideration of aspects of a defendant's background); *Wilson v. Sirmons,* 536 F.3d 1064, 1088 (10th Cir.2008) (finding "there is no substitute for the information counsel can glean from the family when researching the defendant's background, as they are almost always the only people who can provide a complete narrative of the defendant's life").

Weik contends counsel were ineffective for failing to elicit meaningful mitigating evidence from Amy, Chris, Maggie, Bill, and Russell during the mitigation phase. Weik argues these witnesses would have provided substantial mitigating evidence

regarding his social history and background, and particularly about his tyrannical and psychotic father. Further, Weik argues the omitted mitigation evidence was critical for impeachment and cross-examination of the State's forensic psychologist expert, who largely painted a picture of Weik's childhood as normal.

The PCR judge erred in finding counsel presented all available mitigation evidence to the jury. Though counsel introduced *psychological* testimony regarding Petitioner's mental illness, counsel failed to present even a skeletal version of Petitioner's *social history* even though there was abundant social history evidence available to them.

Despite counsel's delay in beginning the mitigation investigation, defense investigators were nevertheless able to uncover substantial mitigating information about Petitioner's social history and provided counsel with written reports detailing that information. Yet, counsel simply failed to present any of this mitigating evidence to the jury; rather, the mitigation presentation consisted solely of Amy's extremely limited testimony, which was general, vague, and offered no detail or insight into the degree of abuse Weik suffered as a child. Thus, the jury remained unaware of the severity and pervasiveness of the physical and psychological abuse Weik faced and the full extent of his father's mental illness. The fact that the jury never heard this mitigating evidence can be attributed only to counsel's failure to review the investigators' reports they possessed in their own case files to become aware of the wealth of information that had been uncovered.

■■ The PCR court further erred in finding counsel's failure to present this mitigating evidence was the product of a strategic decision. " 'Where counsel articulates a valid reason for employing a certain strategy, such conduct will not be deemed ineffective assistance of counsel.' " *Council v. State*, 380 S.C. 159, 175, 670 S.E.2d 356, 364 (2008) (alteration omitted) (quoting *Watson v. State*, 370 S.C. 68, 72, 634 S.E.2d 642, 644 (2006)). "Counsel's strategy will be reviewed under 'an objective standard of reasonableness.' " *Id.* (quoting *Ingle v. State*, 348 S.C. 467, 470, 560 S.E.2d 401, 402 (2002)). Here, Beauford did not interview, or even review the investigators' interviews of, Weik's family members. Thus, Beauford did

not rely upon or even review the wealth of social history information he possessed before trial in determining whether to subpoena Weik's family members to testify during the mitigation phase. Likewise, Hardee–Thomas reviewed nothing and emphatically disclaimed responsibility for making any strategic choices in Petitioner's case.[19] Thus, we cannot conclude that counsel made any reasoned, strategic choices regarding which witnesses would testify—there simply was no mitigation strategy regarding Petitioner's social history.

We find the decision to call only Amy to testify in mitigation resulted from counsel's inattention, not reasoned strategic judgment. *See Wood v. Allen,* 558 U.S. 290, 304, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010) (emphasizing the distinction between the issue of whether counsel made a strategic decision in the first place and the issue of whether a strategic decision is a reasonable exercise of professional judgment under *Strickland* ); *Wiggins,* 539 U.S. at 526–27, 123 S.Ct. 2527 (finding the state court's invocation of the "strategic decision" doctrine to justify counsel's failure to pursue mitigating evidence "resembles more a post hoc rationalization of counsel's conduct than an accurate description of [counsel's] deliberations prior to sentencing").

██ Indeed, counsel did not undertake a strategic decision to omit the mitigation evidence identified above; counsel simply did not read the investigators' reports and therefore did not know such evidence was available. Decisions made in ignorance of relevant, available information cannot be characterized as strategic. *See, e.g., Porter v. McCollum,* 558 U.S. 30, 39–40, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (finding counsel's failure to "even take the first step of interviewing witnesses or requesting records" did not reflect reasonable professional judgment); *Johnson v. Bagley,* 544 F.3d 592, 605 (6th Cir.2008) (finding the failure to present substantial mitigating evidence regarding capital defendant's "remarkably traumatic childhood" was the result of counsel's "bungling or sheer laziness" and not a reasoned strategic decision warranting deference); *Haliym v. Mitchell,* 492 F.3d 680, 716 (6th Cir.2007) (finding where a capital defendant "had everything

---

19. The representation by Hardee–Thomas is especially troubling, for she simply washed her hands of the case, leaving the entire representation to Beauford.

to gain and nothing to lose" by introducing certain mitigating evidence during the penalty phase, there was "no rational trial strategy that would justify the failure of [ ] counsel to investigate and present [such] evidence" (citations and quotations omitted)); *Anderson v. Sirmons*, 476 F.3d 1131, 1145–46 (10th Cir.2007) (finding where counsel's decision not to present readily available evidence in mitigation was made in ignorance of relevant facts, such a decision could not be considered a "tactical decision"); *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir.2001) (finding counsel's uninformed decision not to present favorable evidence "was not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefitting his client that the federal courts have denominated 'strategic' and [have] been especially reluctant to disturb"); *Loyd v. Whitley*, 977 F.2d 149, 159 (5th Cir.1992) (finding where significant mitigating evidence in a capital case was not presented to the jury, "[c]ounsel 'did not *choose*, strategically or otherwise, to pursue one line of defense over another. Instead, he simply abdicated his responsibility to advocate his client's cause.'" (quoting *Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir.1985))). Accordingly we find the PCR court erred in finding counsel were not deficient in this regard. Indeed, as the United States Court of Appeals for the Sixth Circuit noted:

> [M]itigation investigation . . . is literally of life and death importance, for if the mitigating evidence is insufficient, the defendant is sentenced to death. In this case, each of [the defendant]'s two attorneys thought the other was handling the investigation of mitigating evidence to be presented at the sentencing phase of the trial. As a result, virtually no mitigating evidence about [the defendant] was discovered or presented. . . . Only one witness, [the defendant]'s mother, was called on behalf of [the defendant] and she was asked very general questions about [the defendant]'s childhood. A reading of the direct examination takes approximately 90 seconds and fills less than three pages of transcript. This failure on the part of his attorneys goes beyond ineffective. It strikes closer to total incompetence. . . . This was no strategic choice not to present mitigating evidence, which would at least be defensible. Here, the attorneys utterly failed to even look for anything that would cause a jury to consider giving their client a life sentence rather than death.

*O'Guinn v. Dutton,* 88 F.3d 1409, 1424 (6th Cir.1996) (en banc) (Merritt, C.J., concurring).

■ As to the prejudice prong of the *Strickland* analysis, we find that in reweighing the aggravating factors against the totality of available mitigating evidence, counsel's deficient representation undermined confidence in the outcome. *See Wiggins,* 539 U.S. at 536, 123 S.Ct. 2527 (finding that had the jury been confronted with considerable mitigating evidence regarding the "sordid details of [Petitioner's] life history," there was "a reasonable probability that it would have returned with a different sentence"); *Lockett,* 438 U.S. at 603, 98 S.Ct. 2954 ("[P]ossession of the fullest information possible concerning the defendant's life and characteristics is highly relevant—if not essential—to the selection of an appropriate sentence." (quotations, alteration, and citations omitted)).

On the whole, the testimony presented at the PCR hearing revealed graphic and detailed accounts of Petitioner's abusive and dysfunctional childhood, saturated with violence and military fantasies, which was not apparent from the scant testimony presented at trial. Moreover, this testimony would have demonstrated Petitioner's genetic predisposition to schizophrenia and helped explain his auditory and visual hallucinations at the time of the shooting. Given that Amy's testimony presented no meaningful evidence of Petitioner's social history, we reject the PCR judge's conclusion that Petitioner merely seeks a "fancier" mitigation case. *See Rosemond v. Catoe,* 383 S.C. 320, 329, 680 S.E.2d 5, 10 (2009) (rejecting the State's argument that the petitioner merely sought a "fancier" mitigation case where no evidence of capital defendant's known mental health issues was presented at trial (quoting *Jones v. State,* 332 S.C. 329, 339, 504 S.E.2d 822, 827 (1998))); *Council,* 380 S.C. at 176, 670 S.E.2d at 365 (finding counsel were ineffective for failing to present only limited mitigation testimony where "there was very strong mitigating evidence to be weighed against the aggravating circumstances presented by the State" and concluding "this evidence may well have influenced the jury's assessment of Respondent's culpability" (citing *Rompilla,* 545 U.S. at 393, 125 S.Ct. 2456)).

Undoubtedly, Russell's testimony revealed he was extremely delusional and his testimony would often wander in a

manner similar to the descriptions of Petitioner's behavior given by defense psychiatrists and psychologists in support of their contention that Petitioner suffers from schizophrenia. Moreover, there was very little testimony presented in mitigation to contradict the State's expert testimony that Petitioner had an average IQ, no history of drug or alcohol abuse, was the child of an "intact family," and developed normally as a child, with no behavioral problems. Given that the circumstances in aggravation were Petitioner's kicking open the victim's door immediately prior to the shooting (burglary) and physical torture (the delay between the first shot and the fatal shot due to Petitioner's gun jamming), we find there is a reasonable probability that the missing details regarding the degree of physical and emotional abuse Petitioner suffered and the full extent of Russell's mental illness and its impact on the Weik household might well have influenced the jury's determination. See *Wiggins*, 539 U.S. at 537, 123 S.Ct. 2527 (finding prejudice is established where "there is a reasonable probability that at least one juror would have struck a different balance").

Accordingly, confidence in the outcome is substantially undermined, and we find Weik was prejudiced by the omission of this significant and readily available mitigating evidence. We reverse the denial of PCR on this issue and remand the case for a new sentencing hearing.[20]

## IV.

We reverse the PCR court and hold that Weik established his entitlement to a new sentencing hearing as a result of trial counsel's failure to present available mitigating evidence regarding his social history. We remand the case for a new sentencing hearing.

**REVERSED AND REMANDED.**

Acting Chief Justice PLEICONES, BEATTY, HEARN, JJ., and Acting Justice JAMES E. MOORE, concur.

---

20. In light of Weik's entitlement to a new sentencing hearing, we need not address the remaining assignments of error concerning the sentencing phase. *See Rosemond*, 383 S.C. at 329, 680 S.E.2d at 10 (holding appellate court need not reach remaining issues when addressed issues are dispositive) (citing *Hughes v. State*, 367 S.C. 389, 409, 626 S.E.2d 805, 815 (2006)).